AIRCO, INC., Plaintiff-Appellee,

v.

ENERGY RESEARCH AND DEVELOPMENT ADMINISTRATION et al., Defendants-Appellants,

and

Cryogenic Technology, Inc., Intervening Defendant-Appellant.

Nos. 75–1855 and 75–1856.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 11, 1975.

Decided Dec. 29, 1975.*

---

* This appeal was originally decided by unreported order on December 29, 1975. See Circuit Rule 28. The court has subsequently decided to issue the decision as an opinion, with revisions of form and one modification made as a result of plaintiff's petition for rehearing (see n. 6, *infra*).

Samuel K. Skinner, U. S. Atty., Chicago, Ill., Anthony J. Steinmeyer, Atty., App. Section, Civ. Div., Dept. of Justice, Washington, D. C., Leon J. Glazerman, Boston, Mass., Bernard J. Nussbaum, Chicago, Ill., for defendants-appellants.

Peter B. Work, Washington, D. C., Hugh L. Moore, Chicago, Ill., for plaintiff-appellee.

Before SPRECHER, TONE and BAUER, Circuit Judges.

PER CURIAM.

Airco, Inc. brought this suit to challenge the award of a government contract to another bidder, Cryogenic Technology, inc. (CTi). The Energy Research and Development Administration (ERDA) (the successor to the Atomic Energy Commission) and ERDA's administrator are named as defendants. Other defendants are the purchaser in the procurement in issue here, Fermi National Accelerator Laboratory (Fermilab), and Universities Research Association, a consortium of universities which manages Fermilab. CTi, the successful bidder, intervened as a defendant after suit was filed.

Most of Fermilab's operating funds are provided by ERDA, which also provides funds to the Lawrence Laboratory in Berkeley, California (Lawrence). Both Fermilab and Lawrence are re-

quired by contract with ERDA to obtain that agency's approval of all their contracts for equipment and services, and they must follow federal procurement regulations in entering into those contracts.

In the negotiated procurement at issue here, Fermilab acted as agent for itself and Lawrence. After an initial round of negotiations, Fermilab selected Airco as the low bidder. ERDA refused to approve the selection because of allegedly improper discussions between Airco and Fermilab after Airco had made its best and final offer. ERDA ordered a new round of negotiations, which ended with the award to CTi.

The District Court granted Airco's motion for preliminary injunction, under which the defendants are

> "enjoined from aiding or supporting performance of and from making any payments under the aggregate contract awarded to CTi in June of 1975, and defendants are further enjoined to suspend all work under the aggregate contract and to stop incurring any costs or making any commitments thereunder."

The defendants appeal the issuance of the preliminary injunction. We reverse.

■ There are some disputes about the facts, and about whether the District Court properly resolved these disputes in Airco's favor on the basis of conflicting affidavits. *Cf. General Electric Co. v. American Wholesale Co.,* 235 F.2d 606, 608–609 (7th Cir. 1956). We find it unnecessary to consider these questions, because we hold that even under Airco's version of the facts, ERDA's actions had a reasonable basis and are therefore entitled to judicial deference. *Rossetti Contracting Co. v. Brennan,* 508 F.2d

1039, 1042–1043 (7th Cir. 1975); *M. Steinthal & Co. v. Seamans,* 147 U.S. App.D.C. 221, 455 F.2d 1284, 1301–1302 (1971). Consequently, we find no likelihood that Airco can prevail on the merits. Since the question is one of law, we are not bound by the District Court's contrary conclusion. *Milsen Co. v. Southland Corp.,* 454 F.2d 363, 369 & n. 9 (7th Cir. 1971); 11 Wright and Miller, *Federal Practice and Procedure,* § 2962 at 636–637 (1973).[1]

The District Court concluded that Airco's conduct during the first round of negotiations was proper, that it was therefore improper for ERDA to require a new round of negotiations, and that it was also improper for ERDA to approve the award to CTi following the second round. We will consider these questions in turn, viewing disputed issues of fact in the light most favorable to Airco.

■ Before turning to the merits, we must address the issue of standing. In *Rossetti Contracting Co. v. Brennan, supra,* 508 F.2d at 1042, the court considered the merits of a disappointed bidder's challenge to a procurement decision after commenting that "the Administrative Procedure Act, 5 U.S.C. § 702, provides a basis for such consideration." Although the standing issue was not briefed or argued in *Rossetti,* this remark cannot be dismissed as dictum because the court had a continuing duty to determine whether a statutory basis for its jurisdiction existed. Recent cases in the other circuits have agreed that disappointed bidders have standing to obtain judicial review. See *Armstrong & Armstrong, Inc. v. United States,* 514 F.2d 402, 403 (9th Cir. 1975), and cases cited therein. We see no need to reconsider the standing issue at this time.

---

1. We do not read *American Medical Association v. Weinberger,* 522 F.2d 921 (7th Cir. 1975), as requiring greater deference to the District Court's view of the law. In that case, the dispute was a factual one concerning the effect of certain regulations on medical care (slip. op. at 5), and the case did not purport to overrule our previous practice. In *Doe v. Bellin Memorial Hospital,* 479 F.2d 756 (7th Cir.

1973), for example, we reversed a preliminary injunction even though the issue was so close as to sharply divide the circuits. (For citations of cases in other circuits that conflict with *Bellin Memorial Hospital* see *Greco v. Orange Memorial Hospital,* —— U.S. ——, 96 S.Ct. 433, 46 L.Ed.2d 376 (1975) (White, J., dissenting from denial of certiorari.))

## The First Round of Negotiations

On July 24, 1974, Fermilab issued a request for proposals (or "RFP") for two helium refrigerators for use in research on superconductivity. It was hoped that this research would lead to the development of energy-saving techniques. The RFP was later modified to call for one refrigerator and one cold box (i. e., a refrigerator minus the compressor unit).

Proposals were submitted by Airco, CTi, and Lotepro Corporation. All three proposals were technically acceptable but priced too high. At Fermilab's request, all three offerors agreed to enter into negotiations regarding price. Following these negotiations, "best and final" proposals were submitted to Fermilab, and on November 21 Fermilab selected Airco as the low bidder. On November 27 and December 6, formal letters of intent were issued to Airco. Under the terms of the RFP, however, no contract could be formed until ERDA's approval was obtained.

On December 6, 1974, CTi filed a notice of protest with the Comptroller General. ERDA investigated CTi's allegations and found them to be baseless. In the course of the investigation, however, ERDA discovered that discussions between Fermilab and Airco had taken place after Airco's selection. According to a TWX from ERDA's area manager to its Director of Procurement, these discussions did not "substantially prejudice" the other offerors, but did create a possible "appearance of impropriety." The area manager informed Fermilab that ERDA had decided not to approve any award under the RFP because of "certain irregularities in the procurement process, consisting primarily of failure to adhere to the procedures set forth in [41 C.F.R.] 1–3.804 and [41 C.F.R.] 1–3.805." These regulations are discussed below.

There is a dispute as to what post-selection discussions took place. Much of the evidence relating to this dispute was destroyed by a Fermilab employee whose husband worked for Airco. Airco now concedes, however, that post-selection discussions took place about warranty and F.O.B. terms.[2] Airco wanted the F.O.B. point changed from Fermilab, as the RFP required, to Airco's California facility. This would shift the risk of loss in transit to Fermilab. Airco also wanted a warranty provision that would disclaim all implied warranties and severely restrict its liability for components manufactured by others. This change would be highly material, especially since it appears that Airco planned to purchase the cold boxes themselves from a foreign supplier. Airco's proposed warranty also limited its liability to the cost of replacement and repair, excluding travel expenses and prorated on the basis of the remaining warranty period. Airco was unsuccessful in its attempts to obtain these contract terms.

ERDA argues that the post-selection discussions violated 41 C.F.R. §§ 1–3.804 and 1–3.805, which provide in pertinent part as follows:

> "Complete agreement of the parties on all basic issues shall be the objective of the contract negotiations. . . . Basic questions should not be left for later agreement during price revision or other supplementary proceedings." Section 1–3.804.

> "Whenever negotiations are conducted with several offerors, while such negotiations may be conducted successively, all offerors selected to participate in such negotiations (see § 1–3.805–1(a)) shall be offered an equitable opportunity to submit such price, technical, or other revisions in their proposals as may result from the negotiations. All such offerors shall be informed of the specified date (and time if desired) of the closing of negotiations and that any revisions to their proposals should be submitted by that date." Section 1–3.805(b).

---

2. CTi's proposal also contained an objection to the warranty term. This might support an inference that CTi, Airco, and Fermilab all believed that post-selection discussion on contract terms would be proper. Their belief could not, however, bind ERDA.

These regulations establish a cut-off date for negotiations and require that all offerors be given equal opportunities to negotiate. See also 41 C.F.R. § 9–59.003(2). The question here is whether the post-selection discussions constituted "negotiations" within the meaning of these regulations.

■ The word "negotiations," as used in these regulations, has been defined by the Comptroller General to include "a series of offers and counter-offers until a mutually satisfactory agreement is concluded by the parties," or "any opportunity to revise or modify its [an offeror's] proposal." 51 Comp.Gen. 479, 480–481 (1972). Under this interpretation of the regulations, which is entitled to our deference (*Ocean Electric Corp. v. Laird,* 154 U.S.App.D.C. 24, 473 F.2d 154, 155 (1972) (per curiam); *Wheelabrator Corp. v. Chafee,* 147 U.S.App.D.C. 238, 455 F.2d 1306, 1316 (1971)), the discussions in question were negotiations. Since these negotiations took place after the cut-off date, they violated the regulations.[3]

■ Airco bases its argument to the contrary on a newly adopted ERDA regulation allowing post-selection negotiations (but only for contracts larger that this one) (40 Fed.Reg. 46343 (1975)), and on a Comptroller General decision upholding a similar NASA regulation (54 Comp.Gen. 408 (1974)).[4] The argument is that if these regulations are consistent with 41 C.F.R. §§ 1–3.804 and 1–3.805, the procedures used here cannot be said

to violate the latter regulations. The assumptions underlying this argument are that §§ 1–3.804 and 1–3.805 apply to all negotiated procurements, and that they cannot be overridden by regulations adopted by particular agencies. Neither assumption is correct.

Sections 1–3.804 and 1–3.805 are contained in part 1 of 41 C.F.R., which consists of the federal procurement regulations of general applicability. Section 1–1.009–2 allows individual agencies to deviate from the general procurement regulations, provided certain procedures are followed. See also 41 C.F.R. § 1–1.008. Thus, the ERDA and NASA regulations on which Airco relies may be valid even if they are inconsistent with § 1–3.805. Airco has never contended that the procurement procedure used here was adopted under § 1–1.009–2.

Furthermore, the preface to § 1–3.805 provides:

"The procedures set forth in this § 1–3.805–1 are generally applicable to negotiated procurements. However, they are not applicable where their use would be inappropriate, as may be the case, for example, when procuring research and development or special services. . . ."

41 C.F.R. § 9–3.805 adds:

"As indicated in [41 C.F.R.] 1–3.805–1, the procedures set forth in [that section] may not be applicable in certain cases. See Part 9–56 for specific in-

---

3. Airco apparently concedes that these regulations apply to the period between selection and final award. For instance, it relies on the District Court's finding that the same regulations were violated by a Lawrence employee's post-selection conduct.

4. The Comptroller General held that the NASA procedure complies with a NASA regulation 41 C.F.R. § 18–3.805–1. This regulation contains some language that is also found in § 1–3.805–1, but NASA has given this language a radically different interpretation. NASA distinguishes between "discussions" and "negotiations." This is a deviation from normal procurement law. See 51 Comp.Gen. 102, 111 (1971), 51 Comp.Gen. 479, 480 (1971). In NASA's distinctive usage, the term "negotia-

tions" refers only to communications for the purpose of finalizing a contract with the offeror who has been selected as most suitable. Only in the rare case in which "the competition is so close that the Source Selection Official directs that definitive contracts be negotiated with two or more offerors," are "negotiations" with more than one offeror undertaken. 54 Comp.Gen. at 410–411. Only in these rare cases do the provisions of 18–3.805 governing negotiations apply. In construing 1–3.804 and 1–3.805, the Comptroller General has not given "negotiations" this restricted meaning. See 51 Comp.Gen. 479, 481 (1972) and 49 Comp.Gen. 402, 406 (1969), concerning pre-selection "negotiations."

structions to be followed for selection of contractors by board process."

The implication is that § 1–3.805–1 is inapplicable when contract selection boards are used, as they are under the NASA regulation and the new ERDA regulation. Thus, the ERDA and NASA regulations on which Airco relies may be entirely consistent with § 1–3.805–1 even though they call for the use of different procurement procedures.

In summary, we are unpersuaded by Airco's argument that the procurement procedures used here must be valid because special regulations allow similar procedures in other circumstances. If anything, the fact that it was found necessary to adopt such regulations suggest that the procedures would otherwise be improper.

■ We find a reasonable basis for ERDA's judgment that Airco's post-selection discussions with Fermilab were improper, and we conclude that the District Court erred in failing to defer to that judgment.

### The Decision to Reopen the Negotiations

■ Airco contends that, despite any possible improprieties in the first round of negotiation, it was improper for ERDA to reopen the negotiations. Airco bases this contention on three facts: (1) the improprieties did not affect the relative standing of the bidders; (2) information concerning Airco's proposal, including the amount of its bid, was communicated to CTi by a Lawrence employee; and (3) Airco had already begun performance under the contract.

The Comptroller General has held that bidding must be reopened even when improper post-selection negotiations do not affect the relative standings of the bidders, because all offerors are entitled to equal treatment. 49 Comp.Gen. 402, 406–407 (1969). The decisions cited by Airco are distinguishable because in those cases all offerors were treated equally. 52 Comp.Gen. 358 (1972); 52 Comp.Gen. 161 (1972); 50 Comp.Gen. 222 (1970).

Similarly, disclosure of the amount of the low bid does not preclude an agency from reopening negotiations when substantial defects existed in the original round of negotiation. In 53 Comp.Gen. 564 (1974), the Comptroller General stated:

"It is our view that the fundamental issue raised is whether upon hearing of the price leak prior to beginning the second round of negotiations the actions of the contracting officer . . were appropriate.

We affirm the determination . . that the contracting officer could not have made an award under the RFP to Swedlow as low offeror after learning of the price leak because Swedlow's offer was unacceptable at the close of the first round of negotiations." 53 Comp.Gen. at 567.

One of the reasons Swedlow's offer was unacceptable was that "it was questioned as to whether Swedloe had, in fact, taken several exceptions to the . . . RFP or if it had merely 'requested' such changes." Id. at 565. This Comptroller General decision provides a rational basis for ERDA's action.

We do not find support for Airco in *Air Terminal Inc. v. Department of Transportation,* 169 U.S.App.D.C. 297, 515 F.2d 1014 (1975) (per curiam). There, the district court found that "insubstantial" flaws in the negotiation were merely a pretext to deprive Air Terminal of its right to a hearing on other charges.[5] These circumstances are not present here. Moreover, the harmful effect of the bid disclosure here was ameliorated by substantial changes in the technical specifications in the second RFP, which made Airco's original bid obsolete, and by Airco's knowledge of CTi's bid, which was disclosed by CTi's protest.

---

5. The *per curiam* affirmance states only that the judgment was affirmed "for substantially the reasons stated in its [the district court's] memorandum order." Counsel for Airco provided us with copies of that unreported order.

As to the fact that Airco had begun performance, Airco cites no authority for the proposition that by beginning performance a bidder can force the government to accept his bid; in fact, even after a contract is awarded the government can terminate it for improprieties in the procurement. See, *e. g.*, 51 Comp. Gen. 479, 483 (1972). Furthermore, at oral argument Airco conceded that it could recover its expenses in the Court of Claims.

Finally, Airco argues that ERDA's decision is not entitled to judicial deference because ERDA's Director of Procurement was allegedly unaware at the time of the decision that Airco's proposed price had been disclosed and that Airco had begun performance. The Director of Procurement, however, was later sent a carbon copy of Airco's April 15, 1975 letter of protest to Fermilab. The letter contains these "vital facts", as Airco calls them, yet the Director did not see fit to change his decision, presumably because like Fermilab he found Airco's protest unpersuasive. Under these circumstances, there is no reason to depart from the "reasonable basis" test. Hence, we uphold the decision to reopen the negotiations.

■ We believe, at any rate, that Airco waived its right to object to that decision. Airco failed to appeal to either the Comptroller General or the courts.[6] Instead it acquiesced in ERDA's decision by participating in the second round of negotiations. Airco evidently was willing to accept a contract if it won the second round, though the technical specifications had been changed to its disadvantage (as it protested in its April 15 letter). Thus, it waived its objections to the change in specifications, and we see no reason why it should not be held to have waived its other objections. It is clear that Airco's real complaint is not that a second round of bidding was held, but that it lost the second round.

### The Second Round of Negotiations

■ CTi was awarded the contract as the low bidder in the second round of bidding. The District Court held that CTi's proposal should have been rejected as "unresponsive." The proposal contained two features the District Court found objectionable. First, CTi said it would accept an order for both refrigerators, either in the form of a single contract or in the form of two separate contracts, but that it would not accept an order for only one refrigerator. At oral argument, counsel for Airco admitted that " 'all or nothing' offers are permissible." Second, CTi requested a change in the termination-for-convenience clause "if two contracts result." Since only one contract was awarded, this request did not require further discussion or negotiation, and hence did not violate 41 C.F.R. §§ 1–3.804 and 1–3.805.

Reversed.

---

**6.** On rehearing Airco challenged the holding in our original order that its informal protest to Fermilab was untimely under 4 C.F.R. § 1–20.-2(a), which requires that a protest be filed within five days after the basis for protest is known or should have been known. Airco points to the definition of "days" in 4 C.F.R. § 20.12 as "working days," and relies on February 28 as the filing date. Lack of timeliness was one of the reasons Airco's protest was denied, according to Fermilab's response of May 12, 1975. The earliest protest that we find in the record is a telegram dated April 11, which was supplemented by a letter dated April 15. Neither these protests nor Fermilab's response to them refers to any earlier protest, although Airco's complaint refers to a February 28 protest. Because we do not find the latter in the record, we are unable to determine whether it existed or whether it was sufficient to preserve Airco's rights. The failure to file a timely informal protest was, however, merely an alternative ground for our decision, and we need not rely upon it.