UNION CARBIDE CORPORATION,
Plaintiff,

v.

Russell E. TRAIN, Individually and as Administrator of the United States Environmental Protection Agency, et al., Defendants.

and

Air Products and Chemicals, Inc.,
Intervening Defendant.

No. 76 Civ. 5272.

United States District Court,
S. D. New York.

Jan. 27, 1977.

Kelley, Drye & Warren, New York City, for plaintiff; Robert Ehrenbard, Robert Crotty, New York City, of counsel.

Gerald Harris, Westchester County Atty., White Plains, N.Y., for defendant Westchester County; Samuel S. Yasgur, Deputy County Atty., White Plains, N.Y., of counsel.

Robert B. Fiske, Jr., U. S. Atty., Southern District of New York, New York City, for defendants Russell E. Train and Gerald M. Hansler; Kent Stauffer, Asst. U. S. Atty., New York City, of counsel.

M. Carl Levine, Morgulas & Foreman, New York City, for defendant John T. Brady & Co., Inc.; David Morgulas, New York City, of counsel.

Webster & Sheffield, New York City, for intervenor-defendant; James V. Ryan, Albert M. Appel, Michael D. DiGiacomo, New York City, of counsel.

## MEMORANDUM

LASKER, District Judge.

Union Carbide Corporation (UC), seeks review of a decision by Gerald M. Hansler, Regional Administrator, Region II, United States Environmental Protection Administration (EPA), rejecting UC's challenge to the bidding procedures followed by Westchester County (Grantee) in letting a contract for the upgrading of a primary sewage treatment facility (Facility). The Facility is being constructed under a grant by the EPA to the Grantee pursuant to Section 202, Title II, Federal Water Pollution Control Act, 33 U.S.C. § 1282, by which EPA will reimburse the Grantee for 75% of the estimated project costs. EPA has promulgated regulations governing the administration of such grants which specify procurement and contracting procedures to be observed by grantees. 40 C.F.R. 35.936 et seq. (1976). UC claims that in letting the construction contract the Grantee violated the regulations by accepting a non-conforming bid.

On October 24, 1975 EPA entered into a grant agreement with the Grantee regarding a proposal to improve the Grantee's wastewater treatment plant in New Rochelle. The purpose of the project is to bring the system into compliance with federal standards which will take effect July 1, 1977. On December 18, 1975 the Grantee issued its Information for Bidders (IFB). Eighteen bids were received. Each contained two alternative means of providing the oxygen required by the sewage treatment process: a pressure swing adsorber generator (PSA) and a liquid addition cryogenic oxygen generator (cryogenic system). All eighteen named UC as supplier of the PSA system and Intervenor-Defendant Air Products and Chemicals, Inc. (APC) as supplier of the cryogenic system. Defendant John T. Brady & Co., Inc. (Contractor) submitted the lowest bid using either system. Since the Contractor's bid for the cryogenic system was lower than that for the PSA, the award was made on the basis of the cryogenic alternative.

The essence of UC's complaint is that the IFB clearly specified use of a PSA generator and that the bids were therefore unresponsive to the extent that they provided for use of a cryogenic system. UC claims that the award to the Contractor authorizing installation of the cryogenic system violated EPA regulations which were designed to insure free, open and competitive bidding.[1] UC asserts that it and other manu-

---

1. Specifically, UC relies on EPA Regulation 35.-936–3, 40 C.F.R. 35.936–3 (1976) (procurement transactions to be conducted so as to provide maximum open and free competition), EPA Regulation 35.936–18(a), 40 C.F.R. 35.936– 18(a) (awards to be made after formal advertising with adequate purchase descriptions), EPA Regulation 35.938–4(c), 40 C.F.R. 35.938–4(c) (bidding documents to include necessary drawings and specifications), EPA Regulation 35.-

facturers have the capacity to supply cryogenic oxygen systems, and that the procedures followed here have denied it an opportunity to bid on such a system. It also complains, albeit indirectly, that if the Grantee and the EPA had followed the regulations, UC's PSA system would have been selected. (Complaint ¶¶ 39–40). UC argues that in addition to the obvious wrong it has suffered, the public has been deprived of the benefits of a fair bidding procedure. UC seeks 1) a declaration that the Grantee's award of the contract and the EPA decision approving the award violated EPA regulations, abused discretion and were arbitrary and capricious and 2) an injunction restraining the use of federal funds for construction of the oxygen generating system, as awarded.[2]

UC moves for a preliminary injunction forbidding payment or use of federal money for the oxygen generating equipment until the General Accounting Office (GAO) has an opportunity to render a second administrative decision on the bid protest in accordance with a procedure set forth in 40 Fed. Reg. 42406, September 12, 1975. The federal defendants, Hansler and Russell E. Train, Administrator of the EPA, and the Grantee move to dismiss or for summary judgment. UC, in turn, cross-moves for summary judgment.

*I. Standing*

The federal defendants challenge UC's standing to bring this suit. In reliance on *Perkins v. Lukens Steel,* 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940) and *Edelman v. Federal Housing Administration,* 382 F.2d 594 (2 Cir. 1967), a more recent Second Circuit decision which followed *Perkins,*

they maintain that an unsuccessful bidder, and *a fortiori* a disappointed supplier, has no standing to challenge the legality of the bidding procedure.

Although these cases would no doubt control if they still were good law, the force of both has been undermined by subsequent case law. In *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970), the court held that a disappointed bidder in a *direct* government procurement contract has standing under the Administrative Procedure Act, 5 U.S.C. § 701, *et seq.* (APA), a statute which did not exist at the time *Perkins* was decided, to bring such a suit. The decision commands respect not only for its persuasiveness, but also because the D.C. Circuit is the forum with by far the most expertise in these matters. *Scanwell* has been followed in numerous other circuits. See *Airco, Inc. v. Energy Research & Development Administration,* 528 F.2d 1294 (7th Cir. 1975); *Armstrong & Armstrong v. United States,* 514 F.2d 402 (9th Cir. 1975); *Hayes International Corp. v. McLucas,* 509 F.2d 247 (5th Cir. 1975); *Cincinnati Electronics Corp. v. Kleppe,* 509 F.2d 1080 (6th Cir. 1975); *Wilke v. Dep't of the Army,* 485 F.2d 180 (4th Cir. 1973); *Merriam v. Kunzig,* 476 F.2d 1233 (3d Cir.), *cert. denied,* 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973).[3] Equally important, Supreme Court decisions since *Edelman* and *Scanwell,* lend substantial support to the *Scanwell* rationale. See, e.g., *United States v. SCRAP,* 412 U.S. 669, 93 S.Ct. 2405, 37 L.Ed.2d 254 (1973); *Association of Data Processing Services v. Camp,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); *Barlow v. Collins,* 397 U.S. 159, 90 S.Ct. 832, 25

938–4(h)(2), 40 C.F.R. 35.938–4(h)(2) (awards to go to lowest responsive bidder), and also Federal Management Circular 74–7, Attachment O, 34 C.F.R. 256 (which duplicates most of the requirements in the foregoing EPA regulations).

2. The prayer for relief also includes an ambiguous request for an order "enjoining defendants from awarding contracts for any nonresponsive bids." (Complaint p. 10) If this refers to an injunction of general application to all contracts awarded under the grant program, it is

unduly broad. If it is directed at the contracts here in issue, it comes too late, since the general contract was entered long before the complaint was filed, and the contract between APC and the Contractor was finalized only four days after the complaint was filed and prior to the application for any injunctive relief. See text at 625, *infra.*

3. The Second Circuit has not had an occasion to rule on the question since *Edelman.* See *Morgan Associates v. United States Postal Service,* 511 F.2d 1223, 1225 n. 3 (2 Cir. 1975).

L.Ed.2d 192 (1970). The principles of standing enunciated in *Scanwell* with respect to bidders on direct government procurement contracts apply with equal logic to procurements, as here, which are funded by government grants and subject to similar regulations to insure fair and competitive bidding. See, e.g., *Airco, Inc. v. Energy Research & Development Administration, supra,* 528 F.2d at 1296; *Rossetti Contracting Co., Inc. v. Brennan,* 508 F.2d 1039 (7th Cir. 1975).

The defendants argue, however, that even if the *Scanwell* rule is applicable here, UC lacks standing because it is not a disappointed bidder, but a supplier. However, Section 10 of the APA entitles any party "adversely affected or aggrieved by agency action within the meaning of the relevant statute" to seek judicial review. 5 U.S.C. § 702. In *Association of Data Processing Services v. Camp, supra,* 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184, the Court held that a person is "aggrieved" within the meaning of § 10 if he has suffered "injury in fact" and is arguably within the "zone of interests" to be protected by the statute. UC meets both of these prerequisites.

In *Simon v. Eastern Kentucky Welfare Rights Organization,* 426 U.S. 26, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976), the Supreme Court somewhat narrowed the scope of *Association of Data Processing Services, supra,* and other previous decisions by specifying that "injury in fact" must include 1) a causal relation between the wrong alleged and the injury complained of and 2) a "substantial likelihood" that the relief sought will actually remedy the wrong. There is no doubt that there is a causal relation between the wrong alleged and UC's injury. If Grantee had interpreted the regulations as urged by UC, either UC's PSA system would have been chosen for installation at the Facility or there would have been a new bid on the oxygen facility so that UC could, if it wished, submit a bid on a cryogenic system as well. Similarly, if EPA had disapproved the bidding procedure followed, UC would at least have had an opportunity to rebid at no disadvantage with other suppliers and, at best, its product might be used. (Throughout the pendency of the bid protest APC conducted its planning on the understanding that it did so at its own risk, and no contract was entered between APC and the Contractor until after the EPA decision.)

The requirement that there must also be a "substantial likelihood" that the relief sought will actually remedy the wrong complained of, 426 U.S. at 45, 96 S.Ct. 1917, poses a more significant hurdle to UC. Its prayer for injunctive relief is narrowly drawn, requesting only a prohibition of the expenditure of federal funds for the construction of the oxygen generating plant.[4] The Grantee has represented to the court that should such an injunction issue, it might well decide to pay for the oxygen plant entirely out of its own funds, because of the disruption, delay and expense which would be caused by a rebidding or an award of the supply contract to UC at this late date. Therefore, even if UC prevails, and even if it persuades us that an injunction is warranted (see infra), UC might be left with a hollow victory. Yet, although the question is not free from doubt, we conclude that *Simon* does not bar UC from bringing suit. The relation between the wrong and UC's injury and the likelihood of meaningful redress are significantly less tangential here than in *Simon.* However speculative the ultimate benefit to UC of the injunction it seeks, it also requests declaratory relief which could serve as the basis for a suit to recover damages for the costs of its bid preparation. See, e.g., *M. Steinthal & Co. v. Seamans,* 147 U.S.App. D.C. 221, 455 F.2d 1289, 1302 and n. 42 (1971). It thus appears that UC stands to gain in a tangible way if it is successful in this lawsuit. Cf. *Santos v. District Council, Carpenters and Joiners of America,* Docket No. 76–7168, 2d Cir., 547 F.2d 197 at 199– 201.

---

4. As explained in note 2, *supra,* to the extent that the request for an injunction goes beyond this it is either too broad or untimely.

No language in the Federal Water Pollution Control Act itself sheds light on the zone of interests it is intended to encompass with regard to the issues raised by UC in this suit. However, the language of the EPA regulations indicates that UC is within the zone of interests under the statutory scheme. EPA Regulation 35.939(a), 40 C.F.R. 35.939(a), permits a protest to be filed by "a party with an adversely affected direct financial interest." It is arguable whether UC's interest here is "direct" within the meaning of the regulation. Nevertheless the EPA administrator found that it is and although his decision does not bind a court, it is significant that the agency charged with the administration of the scheme has concluded that UC is within the zone of interests to be protected. Having themselves determined that UC has standing to protest the award, it would be anomalous to permit the EPA defendants to foreclose judicial scrutiny of their decision on the same ground.

For the foregoing reasons, we conclude that UC has standing to sue.

## II. UC's Motion for Preliminary Injunctive Relief

■■ A preliminary injunction is appropriate only if UC establishes either "1) probable success on the merits and possible irreparable injury, or 2) sufficiently serious questions going to the merits . . . and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Sonesta International Hotels Corp. v. Wellington Associates,* 483 F.2d 247, 250 (2d Cir. 1973). In considering the likelihood of success in this case account must be taken of the heavy burden borne by a party which seeks judicial intervention in the procurement-contracting process. See *M. Steinthal & Co. v. Seamans, supra,* 147 U.S.App.D.C. 221, 455 F.2d 1289, 1296–

97 (1971); *Wheelabrator Corp. v. Chaffee,* 147 U.S.App.D.C. 238, 455 F.2d 1306 (1971). To prevail UC must demonstrate that the determination of the EPA administrator has no rational basis. *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1301. Moreover, the maxim that an agency's interpretation of its own regulation is entitled to great weight, *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965) has special force in an area as esoteric and complex as this. See *M. Steinthal & Co. v. Seamans, supra.*

UC's challenge to the administrative determination raises serious and important questions. It is clear that Section 350.7(b) of the IFB specifies a PSA oxygen generator. The question whether Article 8 expanded the scope of the IFB to include a cryogenic system as acceptable (as determined by the EPA administrator) is not as clear as either side suggests.[5] The extensive submissions on these motions establish that determination of the issue involves not only a number of facts and events surrounding the development of the IFB and the bidding procedure, but also a judgment whether the post-qualification bidding procedure of Article 8 as applied here is compatible with the EPA regulations. Such a judgment is better made by one familiar with the realities of the procurement-contracting process, and not by a simple comparison by an untutored eye of the language of Article 8 and the regulations.

For this reason the determination of the EPA administrator is entitled to deference. The decision reflects careful consideration and provides a reasoned explanation for the conclusion reached. What is troublesome about the opinion, however, is its implicit doubts that the bidding procedure adopted was valid in light of the regulations.[6] It is possible to read the decision to hold only that, although what happened here was

---

**5.** If we were deciding the matter in the first instance and simply from the face of the bidding documents, we would be inclined to agree with UC that Article 8 does not so broaden the IFB. However, this is not the question presented. *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1301–02.

**6.** For example, at one point in this decision the EPA administrator refers to "a number of conceptual procurement problems," despite which he approved the award. EPA decision at p. 7.

technically wrong, the result was fair and equitable and should not be disturbed. Yet even if this interpretation and the conclusion are correct, there remains the important question whether the post-qualification procedure followed here does not present more dangers than benefits to the goal of free and open bidding.

█ In sum, UC raises serious questions which are fair grounds for litigation. However, considering the limited scope of judicial review, UC's argument presently falls short of establishing a probability that the EPA decision will be found to be without reasonable basis. Because the case involves a number of complex considerations in an area with which courts are "unfamiliar . . . and [which they are] ill-equipped to handle," *M. Steinthal & Co. v. Seamans, supra,* 455 F.2d at 1304, it is appropriate that the court defer ruling so that, as suggested by UC, the General Accounting Office may complete its review.[7] (The nature of the GAO determination and the wisdom of seeking the benefit of its expertise where difficult issues of procurement law are presented are discussed in depth by the D.C. Circuit in *Wheelabrator Corp. v. Chaffee, supra,* 147 U.S.App.D.C. 238, 455 F.2d 1306, 1313–17.)

█ A preliminary injunction pending a determination by the GAO is unwarranted, however, because the balance of hardships such relief would impose tips significantly in favor of the defendants. The case comes before the court late in the procurement-contracting process. Not only has the contract long since been let, but construction of the Facility is actually under way. The construction process entails complex coordination and delay in any phase will lead inevitably to serious delay in the remainder.

An affidavit submitted by the Contractor indicates that construction of the Facility commenced in May, 1976; that throughout the ensuing months it has been working closely with APC in planning construction of the oxygen producing facilities; that although much of this work was done at APC's own risk pending the determination of UC's protest by the EPA, a final contract was executed on November 30th (four days after this action was commenced but three days before the return date of the order to show cause); and that construction of the building which will house the oxygen facility has begun, and cannot continue without a further supply of information from APC to the Contractor. APC had committed $375,000 to the Facility as of the commencement of this suit. Shipments are scheduled to occur and payments to come due within the coming month. APC is utilizing the efforts of 60 engineers in the planning and oversight of the project. (Oeler Affidavit, December 3rd, at ¶¶ 17, 18, 19) The effect of delay in their work and in the work of those similarly employed in the engineering organizations of APC's major equipment suppliers will obviously be to increase costs to each of the individual organizations involved, and ultimately, perhaps, to the tax-paying public. An affidavit submitted by the Chief of the Grants Administration Branch of the EPA reflects that the first payment of federal funds to the Grantee, in the amount of $1,094,670., was made on November 24, 1976, two days prior to the commencement of the action.

The foregoing considerations are compelling even though UC seeks only a temporary suspension in the expenditure of federal funds on the oxygen generating facility. Such a halt in federal funding could reasonably be read as indicating that permanent

7. UC initiated a protest proceeding (No. 13–187617) before the GAO on October 12, 1976, after the EPA administrator refused to reconsider his decision. The GAO proceeding was cut short, however, by the initiation of the district court action and the refusal of the EPA to forward the administrative record to the GAO during the pendency of the lawsuit. A representative of the GAO was present at oral argument and assured the court that if request-ed to proceed to determine UC's protest, its determination would be made within twenty-five days after the parties complete their presentation to the agency. (Tr. 9–12) The latter process could take an additional 15–20 days. *Id.* Thus, the GAO's ruling on the challenged bidding procedure and its recommendations, if any, for remedial action should be available to the court within approximately 45 days.

injunctive relief would be likely to follow. The defendants would therefore have to choose between halting all planning, purchasing and construction work for the oxygen facility pending a final resolution or, as Westchester County has suggested, the County might decide to forego federal funding of this aspect of the Facility and continue with the work. In the latter event, injunctive relief for UC would be moot, or at least futile. UC would be limited to declaratory relief or an action for damages.

A final consideration militating against present injunctive relief is that even if it is ultimately concluded that the EPA determination was without rational basis, it is possible that injunctive relief might be denied. As stated by the *Seamans* court:

"even in instances where [a court concludes that there is no rational basis for the agency's decision], there is room for sound judicial discretion, in the presence of overriding public interest considerations to refuse to entertain declaratory or injunctive actions in a pre-procurement context." 455 F.2d at 1301.

The public's interest in ensuring that government-funded contracts are awarded in a fair and equitable manner conflicts with the equally strong public interest in avoiding lengthy disruptions in the contracting and procurement process. In this case the latter interest is augmented by the public interest in the speedy improvement in the Grantee's sewage treatment plant. This consideration is the principle focus of the Federal Water Pollution Control Act grant program out of which this controversy arises. *Seamans* states that such countervailing interests may weigh against injunctive relief in a *pre-procurement* context. They are entitled to increased deference, where, as here, the challenge is made after a contract has been entered or construction begun. See, e.g., *Wheelabrator Corp. v. Chaffee, supra,* 455 F.2d at 1314–15

n. 11; *Curtiss-Wright Corp. v. McLucas,* 364 F.Supp. 750, 774 (D.N.J.1973); *William F. Wilke, Inc. v. Department of the Army,* 357 F.Supp. 988, 994–95 (D.Md.1973).

UC's argument that preliminary or final injunctive relief would not entail extra costs or undue delay is largely conjectural. (Marple Affidavit, December 8, 1976 at 6–7). Its stated ability to provide a PSA system at the original bidding price without delaying the project, *id.,* is unpersuasive because it ignores the costs involved in switching plans in mid-stream, and is in any event irrelevant since this is not the relief it seeks.[8] Even if the injunction sought were to issue, there is serious question whether UC's product would necessarily be used.

For the foregoing reasons, UC's motion for preliminary injunction is denied. Action on the cross-motions for summary judgment is deferred until the GAO has made its finding as to whether the award of the contract complied with applicable regulations.

Submit order on one day's notice.

---

**8.** The request for an injunction referred to in note 2, *supra,* may ultimately be directed to this end. It is not at all clear, however, that this is the case. UC has made no reference in its subsequent presentations to a desire either temporarily or permanently to obtain such a drastic injunction.