**SELF–POWERED LIGHTING, LTD., Plaintiff,**

v.

**UNITED STATES of America, and Robert Batt and Mary K. Scogin, Contracting Officers, United States Army Armament Materiel Readiness Command, Rock Island, Illinois; and "John Doe" true name unknown to plaintiff, person intended being "Finance Officer, U. S. Army, Rock Island, Arsenal, Att: SAR–RI–CF, Rock Island, Ill., 61299, Defendants.**

No. 79 Civ. 6795.

United States District Court, S. D. New York.

June 10, 1980.

Norman Jacobson, Bayside, N. Y., for plaintiff.

Robert B. Fiske, Jr., U. S. Atty. for the Southern District of New York, New York City, for defendants; Jonathan A. Lindsey, Asst. U. S. Atty., New York City, Frank J. Sando, Litigation Div., Dept. of the Army, Washington, D. C., of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is an action by Self-Powered Lighting, Ltd. ("Self-Powered"), a New York corporation engaged in the manufacture of armaments and military equipment against the United States and various officers of the U. S. Army Armament Materiel Readi-

ness Command (the "Army") for a declaratory judgment that a contract entered into on July 31, 1979 between the Army and Saunders-Roe Developments, Ltd. ("Saunders Ltd.") is void, and enjoining payments thereunder.

Jurisdiction is alleged under (1) the Administrative Procedure Act[1] and violations are charged of (2) the Armed Services Procurement Act;[2] (3) the Buy American Act;[3] and (4) various defense acquisition regulations.[4]

Plaintiff was an unsuccessful bidder on the above-named contract. The complaint alleges various irregularities in the process used by the Army to solicit bids for the contract; that the winning bid was unresponsive to the terms of the solicitation, and thus, that the decision to award the contract to Saunders Ltd. was an arbitrary, capricious, and unreasonable action by the Army; and that the award to a foreign corporation unlicensed in the United States to handle the hazardous nuclear materials called for in the contract, and not subject to other federal regulatory provisions and the federal labor laws, violates federal law.

On December 14, 1979 plaintiff moved to enjoin payments by the government to Saunders Ltd. pending final determination of the contract's legality. The government cross-moved for summary judgment. After hearing the parties, the Court denied preliminary relief because plaintiff had failed to prove either "possible irreparable harm" or "a balance of hardships tipping decidedly in [its] favor."[5] The Court reserved decision on the government's summary judgment motion pending administrative review of plaintiff's protest by the Office of the Comptroller General of the United States (the "Comptroller"), which has jurisdiction under the Bid Protest procedures to review the agency action at issue here and to ren-

---

1. 5 U.S.C. §§ 701(a) & 702.

2. 10 U.S.C. § 2304(a).

3. 41 U.S.C. §§ 10a, 10d.

4. See, e. g., 32 C.F.R. Parts 1–39 (Armed Services Procurement Regulations).

5. *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 206–07 (2d Cir. 1979). See *Caulfield v. Board of Educ.*, 583 F.2d 605, 610 (2d Cir. 1978); *Selchow & Righter Co. v. McGraw-Hill Book Co.*, 580 F.2d 25, 27 (2d Cir. 1978).

der a non-binding determination.[6] In an opinion dated March 13, 1980 the Comptroller denied plaintiff's protest and concluded that the Award to Saunders Ltd. was in accordance with requisite administrative procedures and did not violate applicable procurement statutes or regulations.[7] Upon an independent consideration of the legal and factual issues the Court reaches the same conclusion.

## I. The Facts

Although plaintiff's response pursuant to Local Rule 9(g) alleged no fewer than twenty-two controverted issues of fact, in its latest submission, plaintiff concedes "there do[ ] not seem to be any issues of fact now that both parties have submitted voluminous papers and exhibits." We take this statement as an admission that the matter is properly before the Court for summary judgment.[8] Thus is appears the parties are in accord that the matter is ripe for summary judgment disposition.

The undisputed facts indicate that on July 20, 1978, the Army mailed a Request for Proposal, or solicitation, to fifteen American firms, including the plaintiff and the Minnesota Mining and Manufacturing Company ("3M"), in which it solicited bids for 82,750 front sight-post assemblies for use on the M16/M16A1 rifle. Previously, all past procurements for low-light post assemblies had been awarded to 3M, which was the only known manufacturer of promethium, the radioactive material in such low-light sights. After the solicitations had been issued, the Army decided, for safety reasons, to use in the sights tritium, a radioactive *gas* which disperses if accidently released, rather than promethium, a radioactive *liquid* which contaminates the rifle user and environs if the sight is damaged. Either type of sight affords a rifleman so equipped the ability to sight and shoot at night. Accordingly, the request for proposals required that the sights contain a spherical-ended luminescent bead containing tritium, a nuclear by-product; this required that offerors be licensed by the Nuclear Regulatory Commission to handle such materials. Offerors intending to use government-furnished property were required to submit written permission from the contracting officer having jurisdiction over the property. The solicitation did not contain a "notice of potential foreign source competition."

Prior to the issuance of the solicitation, the Army had determined, pursuant to an exception to the Armed Forces Procurements Act,[9] to conduct the procurement by negotiation, rather than formal advertising. Pursuant to the Act, the contracting officer charged with obtaining the procurement had determined on June 9, 1978 that it was "impracticable to obtain competition by formal advertising," since the only known

6. See 4 C.F.R. Part 20. Strong policy reasons favor an initial review by the Office of the Comptroller General, both because of its particular expertise in the difficult issues of procurement law and because it is empowered in appropriate circumstances to take corrective action that would obviate the need for litigation. *See Wheelabrator Corp. v. Chafee*, 455 F.2d 1306, 1314 (D.C.Cir.1971); *Hayes v. McLucas*, 509 F.2d 247, 258 n.17 (5th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975); *Union Carbide Corp. v. Train*, 73 F.R.D. 620, 625 (S.D.N.Y.1977).

7. *In re Self-Powered Lighting, Ltd.*, No. B–195935, slip op. (G.A.O. March 13, 1980).

8. Plaintiff's Memorandum of Law, filed April 28, 1980. Even had plaintiff not made this admission, the matter would nevertheless be ripe for summary disposition. Scrutiny of the items originally alleged to be "controverted issues of fact" reveals that in reality each contested item is argumentative or states a conclusion of law. The material facts, presented in documents and exhibits, are beyond dispute. Plaintiff's motion for a preliminary injunction was heard before it admitted that no factual matters were in dispute.

9. 10 U.S.C. § 2304(a)(10). This section states the general rule that "[p]urchases of and contracts for property or services [intended for public use] shall be made by formal advertising in all cases in which the use of such method is feasible and practicable under the existing conditions and circumstances." However, the exception permits "the head of an agency" to negotiate such a purchase or contract, if "the purchase or contract is for property or services for which it is impracticable to obtain competition."

manufacturer of the requisite nuclear materials was 3M, which, as already noted, in the past had been awarded all similar procurement contracts for low-light, front sight-post assemblies. The contracting officer reasoned that "in the event that only one proposal was received, the best interests of the government would be served by having the ability to obtain cost and pricing data and negotiate [the] price." That course of action would not be possible if the procurement had been obtained through formal advertising. The negotiation procedure permits great flexibility. To protect the government's interest, the contracting officer determined that the solicitation would be "unrestricted," and that "any interested company" would be allowed to participate in it.

Ultimately, a total of 47 solicitations were issued by the Army. Five proposals were received by the date set for receipt of proposals. Plaintiff's offer was the lowest of these. The offer of Saunders Ltd., a United Kingdom corporation, was second low and was accompanied by an engineering change proposal seeking approval for the provision of flat-ended rather than spherical-ended beads. Saunders Ltd.'s initial proposal also indicated that it intended to use government-furnished equipment, but did not include the required written permission to do so.

By letter dated September 18, 1979, the Army asked plaintiff to confirm its bid, which was substantially lower than those of its competitors to which it responded by increasing its unit price by almost fifty percent, raising it above Saunders Ltd.'s offer. However, although Saunders' offer was then the lowest, its bid could not be considered because its initial proposal did not include the written permission for use of government-furnished equipment. As a result, plaintiff up to that point remained the low offeror eligible for award.

Thereafter, negotiations were reopened and best and final offers were requested

from each offeror on November 22, 1979. Although Self-Powered remained the low, eligible offeror, action to award the contract to it was deferred because Saunders Ltd. had been asked to submit its best and final offer without being advised of its ineligibility for award by reason of its proposed use of government equipment. Consequently, the contracting officer determined to hold a new round of best and final offers. All offerors were advised that the Request for Proposal requirements with respect to government-furnished property had to be strictly complied with, and that the tritium beta lights could have either spherical ends, as originally specified, or flat ends, as the result of acceptance of Saunders Ltd.'s engineering change proposal. In the final round, Saunders Ltd.'s new best and final offer displaced that of Self-Powered as the low, eligible bid. The contracting officer verified the authority of the signer of Saunders' offer to commit the company to a contract, and awarded the contract to Saunders Ltd. Performance has already commenced, although payment has not yet been made.

In its motion for summary judgment, the government contends that Self-Powered lacks standing to present the claims alleged herein; that the Court lacks subject matter jurisdiction over the action; that the plaintiff failed to join Saunders Ltd., an indispensable party; and that in any event, the claims should be rejected on the merits. We turn now to the first and last of these contentions.

II. *Standing*

The government's initial contention is that Self-Powered has no standing as an unsuccessful bidder to challenge the award. There is substantial support for this contention. More than a decade ago, in *Edelman v. Federal Housing Administration*,[10] our Circuit Court held:

"[I]t is well established that an unsuccessful bidder has no standing in a suit to

10. 382 F.2d 594 (2d Cir. 1967). *See also Perkins v. Lukens Steel Co.*, 310 U.S. 113, 60 S.Ct. 869, 84 L.Ed. 1108 (1940). *But see Scanwell*    *Laboratories Inc. v. Shaffer*, 424 F.2d 859, 866–68 (D.C.Cir.1970).

challenge the legality of the bidding procedure. . . . Bidding procedures are for the benefit of the public generally and confer no private rights on the bidder. It avails appellant nothing to assert that he is not an unsuccessful bidder because Talley's bid was void; this is the issue which he is barred from litigating." [11]

Plaintiff seeks to avoid the explicit language of *Edelman* by suggesting that its holding has been rejected by other circuit courts, and that its authority has been eroded in our own. Although there is some support for these assertions, the fact remains that *Edelman* is the law of this Circuit.

It is true that the Circuit Court for the District of Columbia has held, in *Scanwell Laboratories, Inc. v. Shaffer* [12] that a disappointed bidder on a government contract has standing under section 10 of the Administrative Procedure Act [13] to challenge the award, and that the Court has power to review the award to determine whether it was " 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' " [14] Moreover, that decision, followed by most other circuits, [15] held that such review is presumed appropriate in the absence of an explicit Congressional directive to the contrary. In our own Circuit, at least three

district courts have opted to follow the *Scanwell* approach rather than *Edelman*. [16] One court has even suggested [17] that the Second Circuit may have abandoned the *Edelman* approach in its more recent decision of *Morgan Associates v. United States Postal Service*. [18] In *Morgan* the district court followed the *Edelman* ruling and dismissed the complaint of a disappointed bidder for lack of standing. [19] On appeal the Second Circuit did not consider the question of standing but decided the case on the merits "[b]ecause of this unusual need for a prompt decision," and because it considered the plaintiff/appellant's legal position "so weak on the merits." [20] In doing so, the Court refrained from considering the *Scanwell* doctrine, though without specifically disavowing it; it thereby left the rule of *Edelman* intact. We are bound by that rule.

Nevertheless, the clear trend of recent cases toward adoption of the *Scanwell* rule may well presage the eventual abandonment of *Edelman*. Like the Court in *Morgan Associates*, we conclude that no useful purpose would be served by a remand in the event that *Edelman* is overruled, particularly because plaintiff's position on the merits is weak. Moreover, the public interest in swift and conclusive resolution of challenges to public contracts is strong, [21] partic-

---

11. *Edelman v. Federal Housing Admin.*, 382 F.Supp. 594, 597 (2d Cir. 1967) (citations omitted).

12. 424 F.2d 859 (D.C.Cir.1970).

13. 5 U.S.C. § 702.

14. *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859, 874 (D.C.Cir.1970) (*quoting* 5 U.S.C. § 701(a)(2)).

15. *See, e. g., Airco Inc. v. Energy Research & Dev. Admin.*, 528 F.2d 1294, 1296 (7th Cir. 1975); *Armstrong & Armstrong v. United States*, 514 F.2d 402, 403 (9th Cir. 1975); *Cincinnati Electric Corp. v. Kleppe*, 509 F.2d 1080, 1086 (6th Cir. 1975); *Wilkie v. United States*, 485 F.2d 180, 182–83 (4th Cir. 1973); *Merriam v. Kunzig*, 476 F.2d 1233, 1240–41 (3d Cir.), *cert. denied*, 414 U.S. 911, 94 S.Ct. 233, 38 L.Ed.2d 149 (1973).

16. *See John W. Danforth Co. v. Veterans Admin.*, 461 F.Supp. 1062, 1069 (W.D.N.Y.1978); *Schiavone Const. Co., Inc. v. Samowitz*, 451

F.Supp. 29, 31 (S.D.N.Y.), *aff'd*, 578 F.2d 1370 (2d Cir. 1978); *Union Carbide Corp. v. Train*, 73 F.R.D. 620, 622–23 (S.D.N.Y.1977).

17. *See John W. Danforth Co. v. Veterans Admin.*, 461 F.Supp. 1062, 1069 n.4 (W.D.N.Y. 1978).

18. 511 F.2d 1223 (2d Cir. 1975).

19. *Morgan Assoc. v. United States Postal Service*, 387 F.Supp. 947 (S.D.N.Y.), *aff'd on other grounds*, 511 F.2d 1223 (2d Cir. 1975).

20. 511 F.2d at 1225.

21. *See Edelman v. Federal Housing Admin.*, 382 F.Supp. 594, 597 (2d Cir. 1967); *Schiavone Construction Co., Inc. v. Samowitz*, 451 F.Supp. 29, 31 (S.D.N.Y.), *aff'd*, 578 F.2d 1370 (2d Cir. 1978). *See also Cincinnati Electronics Corp. v. Kleppe*, 509 F.2d 1080, 1089 (6th Cir. 1975); *Wheelabrator Corp. v. Chafee*, 455 F.2d

ularly when defense materiel is involved.[22] Thus, we pass directly to the merits of the dispute.

## III. The Merits

### A. The Procurement Procedures

Plaintiff first claims that the procedures leading to the contract award were improper. Specifically, Self-Powered challenges the Army's decision to conduct a negotiated procurement, rather than one by formal advertising. The Comptroller correctly noted in his decision that this impropriety, if it be such, was "apparent on the face of the solicitation";[23] that plaintiff failed timely to object to it, as is required by the applicable regulations;[24] and that its subsequent participation in the procurement constitutes a waiver of objection.[25] Moreover, even if plaintiff had timely protested, it would not now be entitled to judicial review. Even the Circuit Court for the District of Columbia, which has taken the most expansive view of federal jurisdiction to review agency determinations, has held that a contracting officer's decision to proceed by negotiated procurement rather than formal advertising is " 'committed to agency discretion by law' " and thus, not subject to any judicial review.[26] However, even if the decision were reviewable under the *Scanwell* standard, the Army's determination to proceed by negotiation could be overturned only upon a showing that it rested upon "no rational basis."[27] In the instant case, the undisputed facts suggest that there was ample reason for the procurement officer to believe that at most only a few companies would bid on the contract, and that the public interest would best be served through negotiated bidding. The fact that only five bids were received substantiates, after the fact, the officer's conclusion.

The use of negotiated procedures permits the contracting officer to alert bidders to any errors in their bids in order to allow corrections, as well as to negotiate any acceptable design changes proposed by the bidders. In this instance, both such events actually occurred; and both Self-Powered and Saunders Ltd. were the beneficiaries of the negotiation procedures. Self-Powered's initial bid contained an error which, when rectified, resulted in a unit price increase of almost fifty percent. Had formal, advertised procurement been used, Self-Powered might well have been awarded the contract and required to perform on the basis of its erroneously low bid to its economic detriment. Likewise, Saunders Ltd.'s first bid erroneously included an item of government-furnished equipment, which was later deleted; and it was also accompanied by an engineering change proposal, approved by the government, which provided for flat-ended rather than spherical beads. In short, both the Army and the bidders profited from the give and take of the negotiation procedures. Although the contracting officer's belief, at the time of his findings and determination, that only one firm would bid on the contract ultimately proved erroneous, there is no evidence to suggest that it was irrational or arbitrary and capricious. Subsequent events confirm that

1306, 1317 (D.C.Cir.1971); *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1300 (D.C.Cir. 1971).

**22.** *See Hayes Int'l Corp. v. McLucas*, 509 F.2d 247, 257–58 (5th Cir.), *cert. denied*, 423 U.S. 864, 96 S.Ct. 123, 46 L.Ed.2d 92 (1975).

**23.** *In re Self-Powered Lighting, Ltd.*, No. B–195935, slip op. at 6 (G.A.O. March 13, 1980).

**24.** Allegations of improprieties apparent on the face of a solicitation must be filed prior to the date set for receipt of initial proposals. *See* 4 C.F.R. § 20.2(b)(1) (1980).

**25.** *See Airco Inc. v. Energy Research & Dev. Admin.*, 528 F.2d 1294, 1300 (7th Cir. 1975).

**26.** *Wheelabrator Corp. v. Chafee*, 455 F.2d 1306, 1317 (D.C.Cir.1971) (*quoting* 5 U.S.C. § 701(a)(2)). The Armed Services Procurement Act explicitly makes such determinations "final." 10 U.S.C. § 2310(a) & (b).

**27.** *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C.Cir.1971); *Schiavone Construction Co. v. Samowitz*, 451 F.Supp. 29, 31 (S.D.N.Y.), *aff'd*, 578 F.2d 1370 (2d Cir. 1978). *See also Airco Inc. v. Energy Research & Dev. Admin.*, 528 F.2d 1294, 1299 (7th Cir. 1975).

there was a reasonable basis for the Army's decision to conduct a negotiated procurement, and that all parties profited from that decision.

■ Plaintiff also challenges the contracting officer's determination that the signer of Saunders Ltd.'s bid had the authority to bind the bidder. It points to the fact that the successful bidder, Saunders Ltd., is a British corporation with no offices in the United States; that although the bid was signed by the "managing director" of that company, a Mr. D. J. Guthrie, Guthrie's signature was confirmed by Mr. Eric Paisley, President of Saunders-Roe Developments, *Incorporated,* a domestic corporation headquartered in North Carolina which plaintiff urges has no ostensible connections to the successful bidder. It contends that there is no evidence in the record to establish that Paisley possessed the requisite authority to bind, and thus, that the decision to accept Saunders Ltd.'s bid was arbitrary. This claim is without substance. It is beyond dispute that the "evidence required to establish the authority of a particular person to bind a corporation is for the determination of the contracting officer."[28] The record indicates that the bid itself was signed by Mr. D. J. Guthrie, the "managing director" of the bidder corporation; that before accepting the bid, the contracting officer spoke by telephone with Mr. Paisley to verify Guthrie's signature, which Paisley did, both orally and in writing; and that licensing documents submitted by the bidder list Paisley as a representative of Saunders-Roe Developments *Limited.* Moreover, after the bid had been accepted, Saunders Ltd. began actual performance under the contract. In the absence of any evidence to suggest Paisley was unauthorized to verify Guthrie's signature, it cannot be said that the contracting officer's determination was without rational basis.

B. *Buy American Act*

Plaintiff alleges two violations of the Buy American Act[29] in connection with this procurement: (1) that Saunders Ltd.'s offer was improperly exempted from the application of the Act, and (2) that the original solicitation was defective in that it failed to contain the mandatory notice to domestic offerors of potential foreign competition. Neither of these arguments is of substance.

■ The Act requires government agencies to purchase for public use only American manufactured and produced end-products, "unless the head of the department or independent establishment concerned shall determine it to be inconsistent with the public interest, or the cost to be unreasonable . . . ."[30] The government contends that the "public interest" exception to the Act is applicable in this case. In a Memorandum of Understanding ("MOU") dated September 24, 1975, the governments of the United States and the United Kingdom agreed to a policy of fostering "greater standardization and interoperability of their weapons systems . . . [and] assur[ing] the maintenance of a long term and equitable balance in reciprocal purchasing of defense equipment." In furtherance of that policy, they agreed to exempt both government-to-government and government-to-industry contracts for the procurement of military equipment from the application of "price differentials under Buy-National Laws." The Memorandum was specifically implemented by a Determination and Finding, dated November 24, 1976, in which the Secretary of Defense concluded that, with respect to "all items of UK produced or manufactured Defense Equipment other than those items which have been excluded from consideration under the MOU, . . . it is inconsistent with the public interest to apply the restrictions of the Buy American Act." In the face of the broad, inclusive language of both the MOU and the Secretary's Determination, the plaintiff argues that the exemption applies only to military equipment purchased outside the country for use by NATO forces

---

**28.** 32 C.F.R. § 20–102(c) (1979).

**29.** 41 U.S.C. § 10a.

**30.** *Id.*

stationed in Europe; or at least for equipment intended to be interoperable with that in use in NATO countries.

Although the Secretary's Determination does mention these two goals, they are not the exclusive purposes of the exception. Plaintiff's crabbed reading of the introductory language in the Secretary's Determination is at odds with the sweeping language of its conclusion, quoted above, and with the promises of broad cooperation embodied in the MOU. Moreover, plaintiff's interpretation conflicts with that of the agencies involved; both the Department of Defense and the Army have consistently interpreted the MOU and the Secretary's Determination as creating a blanket exemption from the provisions of the Buy American Act for United Kingdom defense products, with the exception of those products specifically excluded by the MOU.[31] We find this interpretation reasonable; indeed, it is the only one that accords with the clear language of these two documents.

Even if it were true that the Secretary's Determination exempted only defense items intended to be interoperable with those employed by NATO forces in Europe, the award to Saunders Ltd. would nevertheless be valid. The subject of the procurement—combat material for use by the United States Army—though not specifically earmarked for NATO forces in Europe, obviously could be employed for that purpose, if so needed. Moreover, the acceptance by the Army of the design change proposed by Saunders Ltd. necessarily furthered the goal, announced in the MOU, of making American weapons interoperable with those in use by our European allies.

■ Plaintiff's second objection under the Buy American Act is equally without merit. Plaintiff alleges that the requirement that Notice of Foreign Competition be included in Defense Department solicitations is mandatory; and that in this in-

stance, such notice was not included in the Army's Request for Proposal. Thus, plaintiff contends that the solicitation was void ab initio. This argument fails in several respects. First, the Comptroller has consistently held that the contracting officer is not required to give notice of potential foreign competition to other bidders when the foreign bidder is found to be exempt from the Buy American Act's other requirements.[32] If this interpretation is correct, no notice was required. Even if it is not correct, at most the Army was required only to give notice when there was a reasonable basis upon which to believe that foreign competition was forthcoming. The applicable regulation states: "Solicitations issued which anticipate foreign source competition under an offset agreement [such as the MOU] will contain a 'Notice of Potential Foreign Source Competition' provision."[33] As has already been mentioned, the Army's determination, based on prior experience that 3M would be the only bidder, had a rational basis. There was no evidence in the record to suggest that a foreign corporation would bid on the contract; there was no reason for the contracting officer to have "anticipate[d] foreign source competition," and thus, no requirement that such notice be given. Indeed, to have issued notice under such circumstances, when the possibility of foreign source competition was only remote, would have misled domestic competitors and diluted the significance of the notice requirement.

■ Finally, we reject plaintiff's contention that the Army had a continuing duty to inform all bidders of the existence of foreign competition, once it became known. The regulation requires only that notice be given with the *solicitation* when foreign competition is anticipated. Subsequent negotiations, and even requests for best and final offers, are not "solicitations"; thus, they need not be accompanied by notices of foreign competition.

---

**31.** *In re Self-Powered Lighting, Ltd.*, No. B–195935, slip op. at 11 (G.A.O. March 13, 1980). *See also* Plaintiff's Exh. 3a.

**32.** *In re Self-Powered Lighting, Ltd.*, No. B–195935, slip op. at 12; *Crockett Machine Co.*, No. B–189380, slip op. (G.A.O. Feb. 9, 1978).

**33.** 32 C.F.R. § 6–1310.2(d) (1979).

## C. Licensing Requirements

■ Plaintiff also alleges that the award was void because Saunders Ltd. did not meet the statutory requirement, mentioned in the solicitation itself, that all bidders be licensed by the Nuclear Regulatory Commission to handle, store, or work with radioactive tritium. It argues that Saunders was unfairly favored by the fact that it is located beyond the Commission's jurisdiction. The short answer to this argument is that plaintiff's interpretation of the licensing requirements, if adopted, would preclude all foreign competition. Surely this was not the Congress' intention when it authorized exceptions to the Buy American Act; or the Secretary's, when he exercised one of those exceptions in favor of defense materiel manufactured in the United Kingdom.

All that can reasonably be required of Saunders Ltd. is that its American affiliate, which stores and handles the radioactive materials while they are in the United States, have appropriate licenses for that purpose. Saunders Ltd.'s representative in this country is licensed by the State of North Carolina to "demonstrate and distribute" radioactive materials "manufactured by Saunders-Roe Developments, Ltd., . . . to specific licensees"; to "use" radioactive materials; and to "store any radioactive material shipment . . . not delivered to a customer." This state-issued license is sufficient to meet the requirements of the Nuclear Regulatory Commission.[34] Plaintiff's technical objections to the language of Saunders Ltd.'s license are utterly lacking in merit. We agree with the Comptroller that "[I]t is difficult to imagine what more could be expected of a foreign contractor in a regulated industry than that its United States representative possess a qualifying license. In these circumstances, we do not think that award of the contract to [Saunders Ltd.] contravenes the licensing requirements of the solicitation."[35]

 Finally, plaintiff objects to the fact that Saunders Ltd. is not subject to the affirmative action, equal employment, environmental and other requirements imposed by United States law and that govern domestic bidders. Apart from the fact that there is no allegation that comparable regulatory laws in the United Kingdom are less stringent than those in force here, this argument, based upon a distorted concept of "equality" in bidding, is merely a veiled contention that none of the exceptions to the Buy American Act should ever be applied. The argument is rejected for the reasons already specified.

Accordingly, the motion of the government for summary judgment is granted.

So ordered.

---

34. See 42 U.S.C. § 2021. See generally In re Self-Powered Lighting, Ltd., No. B–195935, slip op. at 13–15 (G.A.O. March 13, 1980).

35. Id. at 15.