GENERAL ELECTRIC COMPANY, Plaintiff,

v.

Juanita M. KREPS et al., Defendants.

Civ. A. No. 76–0473.

United States District Court, District of Columbia, C. D.

Sept. 7, 1978.

Walter H. Fleischer, Alfred F. Belcuore, Alan Y. Cole, Washington, D. C., for plaintiff.

Robert M. Werdig, Jr., Asst. U. S. Atty., Washington, D. C., # 3 Aeronutronic Ford Corp., Dale H: Oliver, Washington, D. C., for defendants.

## MEMORANDUM OPINION

JOHN H. PRATT, District Judge.

This matter involving the January 30, 1976 award by the Department of Commerce of a $37 million contract for a system to improve weather forecasting is before the Court on cross-motions for summary judgment. Plaintiff General Electric Company [GE] seeks a declaration that the contract was unlawfully awarded to defendant Aeronutronic Corporation [Ford], and a permanent injunction compelling the award of the contract at issue to plaintiff.

### A. *Procedural History.*

On March 22, 1976, plaintiff filed this action protesting the contract award. By Order of April 19, 1976, Judge Waddy denied plaintiff's motion for preliminary injunction; our Court of Appeals summarily affirmed that decision by Order of June 1, 1976. Following additional briefing and argument, Judge Waddy determined that "the government procurement contract challenged herein was not arbitrary, capricious or contrary to law and that there was a rational basis for the agency's decision, (*M. Steinthal v. Seamons [Seamans]* [147 U.S.App.D.C. 221] 455 F.2d 1928 [1289] (D.C.Cir.1974))"; and granted defendants' motion for summary judgment by Order of June 15, 1976. The Court of Appeals vacated that decision by Order of May 25, 1977, to permit plaintiff to undertake further discovery and suggested that after completion of such discovery "the District Court of course may entertain motions for summary judgment once again."[1] Following extensive discovery, the issues were briefed and supplemented by oral argument on February 13, 1978. The case is now before us pursuant to reassignment following the recent unfortunate death of Judge Waddy.

### B. *Factual Setting.*

To properly comprehend the respective positions of the parties, it will be useful to set forth the factual background in some detail.

---

1. By way of explanation for its action, the Court of Appeals stated:

   "The complexity of this litigation's factual and regulatory setting counsels a cautious approach, and that counsel prompts us to vacate the award of summary judgment and to remand the case to the district court to afford appellant an opportunity to undertake the discovery it previously sought, including specifically an opportunity to depose the contracting officer, Mr. Cummings, and his assistant, Mr. Mayer."

(1) *Organizational framework.* The National Weather Service [NWS] is a component of the National Oceanic and Atmospheric Administration [NOAA], which in turn is a component of the Department of Commerce.

The Secretary of Commerce, pursuant to the Federal Property and Administrative Services Act, 41 U.S.C. § 251 *et seq.* (1970), has authority to purchase goods and services needed by the Department. This authority has been delegated to his Assistant Secretary for Administration, who, in turn, has redelegated the authority, with exceptions not applicable here, to the Office of Administrative Services and Procurement. Mr. Carroll J. Cummings, Chief of the Materials and Services Branch for the Office of Administrative Services and Procurement, is designated to act on behalf of the Office of Administrative Services and Procurement in entering into and administering contracts.

NOAA has established an internal procedure, set forth in NOAA Directives Manual 36–11, for formulating recommendations for award of procurements entered into by Commerce on behalf of NOAA or NWS. This procedure utilizes a Source Evaluation Board [SEB], and separate technical and financial committees which report to the SEB. The SEB makes a recommendation to the Source Selection Official [SSO], who, in turn, makes his recommendation to the Contracting Officer,[2] an official within Commerce's Office of Administrative Services and Procurement.

(2) *The procurement at issue.* In November 1974, NWS submitted to the Office of Administrative Services and Procurement a request for procurement with respect to a program called Automation of Field Operations and Services [AFOS]. This program involved, *inter alia*, the purchase of certain mini-computers and related data processing equipment. Because the system included minicomputers, Commerce sought authorization from the General Services Administration [GSA] under the Brooks Act to proceed with the procurement.[3] By letter dated March 21, 1975, GSA granted Commerce a delegation of procurement authority [DPA] authorizing the procurement of the AFOS system. The DPA was subject to several limitations. Failure to adhere to the limitations, the DPA states, made the delegation "voidable." On April 14, 1975, the Procurement Division of the Department of Commerce issued the Request for Proposals [RFP]. August F. Mayer, a Contract Specialist in that Division, was the individual designated to provide information with respect to the procurement. The Request for Proposals provided that:

> [F]our prime factors will be considered in the selection of the system contractor— (1) the cost of the system, (2) his proposed system design, (3) his demonstrated technical competence and cost performance, and (4) his management plan. (Appendix, at 30)[4]

A total of 700 points could be awarded—350 for the lowest total cost and 350 for the highest-rated technical proposal. (The technical consideration included a possible 125 points for experience, performance record, and management of the offeror). The contract was to be awarded to the firm receiving the highest number of total points.

NOAA and NWS established (pursuant to NOAA Directives Manual 36–11) procedures for making a recommendation. Dr. John W. Townsend, Jr., Associate Administrator of NOAA, was designated as the SSO. An SEB was established with eight members under the chairmanship of Dr. Richard E. Hallgren, Deputy Director of NWS. The SEB created a ten-man techni-

---

**2.** Plaintiff disputes this interpretation regarding the ultimate decisionmaking authority.

**3.** P.L. 89–306, 40 U.S.C. § 759. The Brooks Act directs the Administrator of the GSA to coordinate and provide for the economic and efficient purchase, lease, and maintenance of automatic data processing equipment by Federal agencies.

**4.** Appellant's Appendix to its Appeal to the U.S. Court of Appeals, hereinafter referred to as "A".

cal committee and four-man financial committee.

On July 7, 1975, Commerce received formal offers from six firms, including GE and Ford. Commerce's technical and procurement representatives then visited the various offerors' facilities and discussed the proposals. On October 14, 1975, in response to an official request from Mr. Cummings, the Contracting Officer, five firms submitted best and final offers to the Department of Commerce.

(3) *The selection process.* The financial and technical committees established by the SEB undertook the first level of evaluations. Their evaluations were separate. The technical committee presented its assessment to the SEB on November 14, 1975. Thereafter, the financial committee made its report. The scores reported by each committee were expressed to a tenth of a point. Normalization of scores resulted in a GE rating of 643.263 and a Ford rating of 643.219; the SEB concluded that a tie existed due to the mathematical insignificance of hundreths of points.[5] The SEB members were equally divided in recommending which of the proposals to select. On December 15, 1975, Dr. Townsend, the SSO, upon consideration of the report of the SEB, recommended to the Contracting Officer that Ford be selected:

> After due consideration of the recommendations of my Source Evaluation Board, I propose Aeronutronics/Ford as the source for procurement in response to your solicitation 5–35243.
>
> Although there is a dead tie in total points, Aeronutronics/Ford's price is $800,000.00 less than the General Electric bid for the high scoring valid option. I recommend, however, that Aeronutronics/Ford be called upon to confirm that maintenance manuals fully responsive to the specifications will be delivered at no increase in price, or if at increased price, the new total price not to upset the total scoring in such a manner as to change the overall results of the evaluation. (A at 151).

On December 18, 1975, representatives of Commerce and Ford met to resolve the matter raised in Dr. Townsend's report to the Contracting Officer, *i. e.*, that "Ford be called upon to confirm that maintenance manuals fully responsive to the specifications will be delivered at no increase in price. . . ." The procuring agency determined that Ford's best and final offer did not replace the factory manuals proposed in the initial offer and that the best and final offer was in full compliance with the RFP manual specifications.

The Contracting Officer referred the report of the SEB and the recommendation of the SSO to Mr. Mayer, a Contract Specialist in his office. After concluding his examination of the underlying documents and conducting certain independent reviews of the conclusions reached therein, Contract Specialist Mayer recommended an award to Ford on three independent bases. *First,* the price submitted by Ford—for a system clearly meeting the technical needs of the Government—was approximately $800,000 lower than the price submitted by GE. *Second,* the Source Evaluation Board had improperly deducted certain points from the Ford offer in the areas of experience and management responsibility. *Third,* the Source Evaluation Board had improperly awarded points to GE in the same area.

The various reports and documentation were then submitted to the Contracting Officer, Mr. Cummings. In a memorandum dated January 12, 1976, he concurred in the conclusions of the Contract Specialist and found specifically that "the points advantage [in the experience and management areas] accorded General Electric vis-a-vis Aeronutronic Ford is not warranted." A at 141. On January 30, 1976, after determining that "delay in the award would be prejudicial to the best interests of the Government," Cummings awarded the contract to Ford. A at 186. Seventeen days later, on February 17, 1976, GE met with the Department of Commerce contracting officials to discuss the basis for the award

5. Deposition of Dr. Richard C. Hallgren (July 12, 1977) pp. 50–51, 96–100.

of the contract to Ford. On February 24, 1976, GE filed a post-award protest with the General Accounting Office. This suit followed.

### C. *Standard of Review.*

■ Our review of a government contract procurement decision is necessarily limited in scope and we are governed by the principles first articulated by Judge Leventhal of this Circuit:

(1) Courts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's decision; and (2) even in instances where such a determination is made, there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a pre-procurement context. *M. Steinthal & Co. v. Seamans*, 147 U.S.App.D.C. 221, 233, 455 F.2d 1289, 1301 (1971).

The absence of a rational basis may be established by a demonstration that "the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner*, 156 U.S.App.D.C. 274, 277, 480 F.2d 1166, 1169 (1973). Plaintiff, in essence, challenges the integrity of the procurement procedure and decision process and, in support of its basic position, has asserted several grounds.

(1) *Challenge to the scoring.*

(a) Scoring of vector coding. Plaintiff argues that an alteration in the SEB scheme for evaluating graphic coding techniques altered illegally and to its detriment the award of points for the procurement at issue. However, this alteration was merely an internal adjustment of a previously confidential scoring scheme which reconciled the scoring process with the publicly disclosed evaluation criteria. See Letter of Robert E. Johnson to Carroll Cummings (March 11, 1976). A at 130. Specifically, since the RFP stated that "[P]oints will be awarded *proportional* to the percentage improvement in graphic data compression over straight Vector Coding" [A at 64], the SEB upon recommendation of the Technical Committee unanimously approved a departure from a previous scheme which awarded points based upon score ranges. A at 331. We cannot conclude that this internal adjustment, effectively mandated by the RFP, was irrational or even improper.

(b) Disregarding differential of hundredths of points. Plaintiff insists that, pursuant to the RFP, it was entitled to the award since its total point score exceeded that of defendant Ford by a fraction of a point. We cannot conclude that the decision of the SEB reporting a tie score was without rational basis; we agree with defendant Ford that the SEB "was [not] required as a matter of law to forego rounding of numbers [and] to carry out all calculations to hundredths of a point." Statement of Points and Authorities of Aeronutronic Ford Corporation in Opposition to Plaintiff's Motion for Summary Judgment at 16. We agree that such extrapolations were "mathematically meaningless." *Id.* at 17.

■ (2) *Challenge to the award.* Plaintiff suggests that, even if this Court should find the scoring process to be proper, it must find the method for breaking the resulting tie score to be irrational. Since the SSO and the contracting officer each independently approved the award of the contract to Ford, plaintiff faces a substantial burden: it must demonstrate that neither official's decision was premised on a rational basis. This it has not done.

Source Selection Official Dr. Townsend, evaluating the presentations of the SEB, recommended selection of Ford based upon its lower price component. *See supra* at 471. He concluded that, between two technically satisfactory proposals, it was proper to select Ford's proposal which was less expensive by approximately $800,000 —a saving of over 2% on a $37,000,000 contract.

We cannot conclude that Dr. Townsend's proposal to award the contract to the lower priced bidder was irrational. Plaintiff's

protest that reliance on price violates the RFP and the balance of scoring criteria proscribed therein misses the essential thrust of the problem facing Dr. Townsend: the RFP did not envision nor did it offer guidance respecting resolution of tie situations. Dr. Townsend rationally reverted to an underlying principle which guides procurement decisions, i. e., select the proposal offering the greatest value to the Government. His decision finds abundant support in judicial and GAO decisions. *See Grey Advertising, Inc. v. Claytor*, decision of the Comptroller General at 16, *aff'd* C.A. No. 75–1479 (D.D.C. Aug. 31, 1977) (cost may be determinative, despite prior consideration thereof, where proposals essentially equal technically).

Mr. Cummings agreed with Dr. Townsend's recommendation not only because of the substantial price differential but for additional reasons suggested by his Contract Specialist Mr. Mayer.[6] Mr. Cummings' decision, in making the award to Ford, was clearly rational.

(3) *Ex parte communications.* The SEB found it necessary to contact both Ford and GE to request clarifications respecting elements of their respective proposals. GE argues that the contacts with Ford were improper and that further contacts with GE should have been conducted.

(a) Discussions with Ford. In recommending the selection of Ford for the contract award, Dr. Townsend suggested that "Ford be called upon to confirm that maintenance manuals fully responsive to the specifications will be delivered at no increase in price, or if at increased price, the new total price not to upset the total scoring in such a manner as to change the overall results of the evaluation." That confirmation was secured at a meeting on December 18, 1975, wherein Ford clarified the relationship between its preliminary and best and final offers. Plaintiff unpersuasively argues that the meeting constituted "negotiations" necessitating a reopening of negotiations with all other offerors. Discussions are deemed "negotiations" only where there exists an opportunity to modify or revise a proposal, a situation clearly not presented here. *See Airco, Inc. v. Energy Research & Development Administration*, 528 F.2d 1294, 1298 (7th Cir. 1975). Ford merely confirmed that its proposal incorporated the RFP directive respecting provision of manuals.[7]

(b) Allegedly inadequate discussions with GE. The offer submitted by GE included a two matrix pricing scheme which effectively constituted a series of alternative proposals. In its deliberations, the SEB attempted to derive an appropriate system by substituting and combining subsystems from the two matrices. In recognition of the difficulties inherent in such an approach, the SEB sought guidance of the contracting officer in determining whether the alternate proposals could be considered compliant with the RFP. After thorough review of the GE proposal, and with the unanimous endorsement of his contract specialist, cost/price analyst, administrative supervisor, and attorney, Cummings concluded that the proposal did not comply with the RFP requirements for a best and final offer: the proposal was deemed to not constitute a firm price offer. *See* Memorandum for File of August Mayer (December 19, 1975) [A at 143] (detailing extensive efforts to interpret and validate GE alternative proposal). Recognizing the difficulties and uncertainties inherent in "constructing" a best and final offer, and believing the extension of an invitation to GE to do so would constitute a reopening of negotiations, Dr. Townsend refused to consider the matrix alternatives.

---

6. In addition to endorsement of the tie-breaking mechanism adopted by the SSO, Cummings adjusted the scores awarded to Ford and GE to compensate for what he perceived to be inequities in the mechanics of scoring by the SEB. We do not need to decide the question of Cummings' authority to make such adjustments, since it is clear from the present record that the award to Ford had a rational basis, even without the benefit of such adjustments.

7. Discussions following this clarification did not alter the essential character of this meeting. Dr. Townsend had recommended selection of Ford as procurement source subject only to this limited qualification.

This decision was eminently rational. Considerable evidence reflects the confusion engendered by the presentation and the inability of numerous qualified persons to derive a clear offer. Plaintiff's challenge to this decision is without merit.

### D. *Equitable Considerations.*

As articulated in part C, *supra*, a court in the exercise of sound judicial discretion may decline to overturn a procurement determination even upon finding that the determination was made in violation of applicable statutes or regulations. This course of conduct is available despite the fact that the concomitant action at law is inadequate: notably, a disappointed bidder may not secure anticipatory profit damages in a government contract situation. *See M. Steinthal & Co. v. Seamans, supra,* 147 U.S. App.D.C. at 234, 236, 455 F.2d at 1302, 1304. Central to such an equitable analysis is the impact of our decision on the public interest.

Although our determination that the contract award decision was rational makes our equitable analysis surplusage, we note that the circumstances currently presented militate heavily against the invocation of our equitable powers. Ford has been performing this contract for over two and one-half years. Considerable costs have been incurred by Ford.[8] Invalidation of this contract award might necessitate the institution of new negotiations: costs have unquestionably increased since bids were submitted in 1975. Further, performance of the NWS would be impeded during any hiatus period. Even if we were to conclude that the procedures followed and final award were without a rational basis, we would be hard put to overturn the award in view of the presence of "overriding public interest considerations." *Steinthal, supra,* 147 U.S.App.D.C. at 233, 455 F.2d at 1301.

### E. *Conclusion.*

Plaintiff, even after extensive discovery permitted by the remand from the Court of Appeals and after extensive briefing, has failed to present facts which would support, much less compel, an exercise of our equitable authority to set aside this procurement award. In short, plaintiff has failed to sustain its burden of showing that the actions of the SEB, the proposal of the SSO, or the final award of the contracting officer lack a rational basis.

---

8. Ford estimates, and GE disputes, the incursion of $32 million of expenses through September 1977.