**HEALTH CARE SERVICE CORPORA-
TION, an Illinois Corporation,
Plaintiff,**

Continental Casualty Company, an
Illinois Corporation, Intervening
Plaintiff,

v.

Joseph A. CALIFANO, Jr., Secretary of
Health, Education and Welfare and
Robert A. Derzon, Administrator,
Health Care Financing Administration,
Defendants.

No. 78 C 3228.

United States District Court,
N. D. Illinois, E. D.

Feb. 13, 1979.

James C. Munson, Kirkland & Ellis, Richard E. Friedman, Epton, Mullin, Miller & Druth, Ltd., Chicago, Ill., for plaintiffs.

Thomas P. Sul'ivan, U. S. Atty., Nancy K. Needles, Asst. U. S. Atty., Lloyd M. Weinerman, Atty., Dept. of Health, Education and Welfare, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

FLAUM, District Judge:

The instant action for declaratory and injunctive relief challenges the award of a five-year contract for the administration of over a billion dollars of medical benefits in the Illinois Part B Medicare Program. Plaintiff Health Care Service Corporation [HCSC] and intervening plaintiff Continental Casualty Company [CNA] challenge the award to a data processing firm, E.D.S. Federal Corporation [EDSF]. Before the court are the parties' cross motions for summary judgment.[1] Fed.R.Civ.P. 56. Jurisdiction is predicated on 28 U.S.C. §§ 1331, 1361, 2201 & 2202. Inasmuch as the court concludes that there are no issues of material fact and that judgment as a matter of law must be entered in defendants' favor, defendants' motion is granted. After a brief statement of the uncontested facts, the court will consider the legal issues presented.

The provisions at issue here are part of a comprehensive scheme to provide health care for the aged enacted in part under the Social Security Act Amendments of 1965.[2] Under those amendments, Congress instituted two distinct health care plans. The so-called Part A Medicare plan provides for basic hospital and related care.[3] The second program, Part B Medicare, which is at issue here, is a voluntary supplemental program for services of doctors and other health care professionals. Such services are not covered under the Part A plan.[4] Under the plan, individuals pay premiums which are matched or exceeded by the federal government.[5]

The 1965 enactments provided that Part B medical benefits would be administered by "carriers." 42 U.S.C. § 1395u(f). Under the relevant section, the term carrier was defined to include private insurers, group health plans and voluntary benefit insurance plans "lawfully engaged" in providing or paying for health services in return for periodic payments from subscribers or policy holders.[6] The carrier requirement was fashioned to make the expertise of the private insurance companies available for the following functions: determination of reasonable charges for covered services; monitoring of physician charges and services; and the institution and maintenance of procedures to resolve payment disputes.

In 1972, Congress amended the Medicare Act. Pub.L.No. 92–603, 86 Stat. 1329, October 30, 1972. Section 222 of the amendment, 42 U.S.C. § 1395b–1, in part authorized the Secretary of Health, Education, and Welfare to conduct experiments related to fixed-price and performance incentive contracts "through grants to public or nonprofit private agencies, institutions, and organizations or contracts with public or private agencies, institutions, and organizations." 42 U.S.C. § 1395b–1(a)(1). Thus, the 1972 amendment makes no reference to "carriers" as defined in 42 U.S.C.

---

1. Upon filing of the instant complaint, plaintiff HCSC filed its motions for a temporary restraining order and for a preliminary injunction. On September 6, 1978 CNA filed its motion to intervene. On September 11, 1978 the motion for a temporary restraining order was denied and the motion to intervene was granted. The motion for preliminary injunction will necessarily be resolved by the parties' motions for summary judgment.

2. The Medicare Act was enacted by Congress as Title I of the amendments, P.L. 89–97, §§ 101–102, 79 Stat. 286, July 30, 1965.

3. The Part A plan derives its name from the fact that it is contained in Part A of Title XVIII, 42 U.S.C. §§ 1395–1395*ll*, as amended, 42 U.S.C. §§ 1395–1395pp. It is also entitled "Hospital Insurance Benefits for the Aged."

Part A is financed largely through hospital insurance taxes. See CCH 1978 Social Security and Medicare Explained, ¶ 601.

4. Part B, logically, is contained in Part B of Title XVIII, 42 U.S.C. § 1395j–1395w. The Part B program is entitled "Supplementary Medical Insurance Benefits for the Aged."

5. Part A and B together are known as "Health Insurance for the Aged," the name of Title XVIII of the Social Security Act, but are also popularly known as the Medicare Act.

6. The Department of Health, Education and Welfare administers Part A through private "intermediaries" who are nominated by groups of institutional health care providers.

§ 1395u(f). It is the resultant tension between these two statutes which forms the principal issue of this case.

Pursuant to its experimental authority under section 1395b–1, the Secretary issued on March 31, 1978 a Request for Proposal [RFP] for administration of the Part B program for the entire State of Illinois through a competitive, fixed-price approach. The RFP was intended to serve a dual function. It was designed to test the effect of merging carrier territories (Cook County and the remainder of the State) and the cost-benefit of price competition among carriers in a medium claims volume territory. Thus, the experiment sought to consolidate claims territory and discover the effect of a fixed-price contract as opposed to the prior cost reimbursement contracts. The proposed contract was to cover a period from July 1, 1978 to September 30, 1983. The RFP outlined a transition and implementation period of nine months, from July 1, 1978 to March 31, 1979, for Cook County and for twelve months, from July 1, 1978 to July 1, 1979, for the remainder of the state.

Among the five bidders responding to the RFP were plaintiff HCSC, intervening plaintiff, CNA, and the awardee, EDSF.[7] HCSC has been the Medicare Part B carrier for Cook County since Medicare's inception on July 1, 1966. It is a non-profit corporation organized under an Illinois law which in 1977 administered benefit programs covering over three million subscribers.[8] CNA, also an Illinois corporation, presently administers the Medicare Part B plan for the rest of the State. Both CNA and HCSC administer the plans under cost reimbursement contracts.[9] The parties do no dispute that CNA and HCSC are "carriers" under 42 U.S.C. § 1395u(f). EDSF is a wholly-owned Texas subsidiary of Electronic Data Systems, also a Texas corporation. EDSF has ·had experience as a Medicaid health insurer in Texas. Further, EDSF has performed as a medicaid fiscal agent and a health care electronic data processor subcontractor in certain states.

Prior to the issuance of the formal request, HCSC was notified through its Vice President by a letter dated March 1, 1978 that the RFP would "not be limited to existing Medicare contractors." He was further advised that third party payers and the offers of data processing firms "who have the necessary technical expertise, resources, and ability to assume and complete the functions of a Medicare carrier" would be considered. On March 7, 1978 the Blue Cross Association was similarly notified. The RFP was formally made available to bidders on March 31. By its terms, it informed them such firms would be considered., In April, 1978 all Medicare Part B contractors were sent letters advising in the above language of the scope of consideration.

On or about May 31, 1978 five offerors submitted their proposals. In late June, the Department of Health, Education, and Welfare [H.E.W.] announced that it had awarded the contract to EDSF. Hence, when the instant lawsuit was filed on August 14, EDSF was six weeks into the implementation period.[10]

---

7. The other two bidders were Prudential Insurance Company of America and General American Life Insurance Company.

8. In 1975, HCSC was incorporated by the State of Illinois as a non-profit health care service corporation thus merging the Illinois Blue Cross and Blue Shield plans. *See* The Non-Profit Hospital Service Plan Act, Ill.Rev.Stat. ch. 32, §§ 551–562f.

9. "A cost reimbursement contract is defined as a method of reimbursing the contractor for all costs of performance determined to be allowable, reasonable and allocable to the contract as described in the agreement." Medicare and

Medicaid Contracting, Report to Administrator, Health Care Financing Administration, Department of Health, Education and Welfare, October 31, 1978 at 64. "The firm fixed price contract is an agreement between the Government and the contractor to deliver specific services at a fixed dollar amount. This dollar amount is generally not adjusted whether or not the contractor has a cost overrun or underrun." *Id.* at 68. For a distinction between the two, see *United States v. Barnard*, 255 F.2d 583, 588 (10th Cir. 1958).

10. By that time, EDSF had incurred expenses by leasing space in Illinois and H.E.W. had

Three issues are raised by the above. First, whether plaintiffs' protest of the scope of the bidding was timely. Second, whether the award of the contract to EDSF was not lawful because that entity was not a "carrier" within the meaning of section 1395u(f) and because EDSF had no prior experience as a carrier. Third, whether the evaluation of the contract proposals was arbitrary, capricious and an abuse of discretion.

■ Defendants first contend that plaintiffs are barred from raising any illegality of the contract award by virtue of the fact they were aware that data processors would be invited to bid and chose not to protest the award. Defendants point to the uncontested fact that both plaintiffs were notified prior to bidding that they would be considered. Further, they note that long prior to the solicitation of the bids, it was common knowledge in the industry that bids would be solicited from data processors.[11] As noted above, plaintiffs had ample notice of EDSF's participation, both by direct communications from defendants and by participating with EDSF in precontract award proceedings.[12] Instead of filing a preaward administrative protest or raising the issue in any way, plaintiffs waited until after the award to EDSF to make such a protest.[13]

By virtue of the aforementioned facts plaintiffs waived their right to protest both the question of EDFS's status as a noncarrier and the alleged unfair evaluations of the proposals in favor of EDSF. *Airco, Inc. v. Energy Research and Development Administration*, 528 F.2d 1294 (7th Cir. 1975) (per curiam) mandates this result. In *Airco*, an initially successful bidder for a government contract lost the contract upon rebidding. The rebidding had been ordered after irregularities in the procurement process had been discovered. The Court of Appeals reversed the district court's entry of a preliminary injunction on behalf of the plaintiff, noting that plaintiff had failed to challenge the rebidding until after it was unsuccessful.

Airco waived its right to object to [the bidding] decision. Airco failed to appeal

---

incurred liability under the transition portion of the contract for more than half a million dollars.

11. A March 17, 1977 solicitation for a similar Maine contract published in Commerce Business Daily, a periodical listing government procurements, contained a notice that "third party payers and data processing firms who have the necessary technical expertise, resources, and ability to assume and complete the functions of a medical carrier" would be eligible for bidding on the contract.

12. On March 2, 1978 a Vice President of HCSC received notice that consideration would not be limited to existing medicare contractors. The letter read, in part, "[t]he solicitation will not be limited to existing Medicare Contractors. Instead, it will be directed to all third party payers and to data processing firms who have the necessary technical expertise, resources, and ability to assure and complete the functions of a Medicare carrier." On March 7, the Blue Cross Association received a similar notice. The RFP issued March 31 contained ample leeway for consideration of data processing firms. In April, all Medicare Part B contractors were sent letters employing similar language. At an April 18 conference, attended by all the parties, the following colloquy was had:

Q. (Prudential) . . . What sources will be used for bidders with previous Medicare experience and what will be used for bidders with no Medicare experience.

A. . . . . If either of the two sources mentioned above [ACERS or Best Insurance Report] is not relevant, we will contact a representative number of references and use a questionaire to determine the quality rating factor. Transcript Proposal Conference, Selection of Medicare Part B Carrier for the State of Illinois, April 18, 1978, at 21.

Further, if there were any doubt, all potential offerors had opportunity to present questions concerning any facet of the procurement plan.

13. Section 1–2.407–8 of the Federal Procurement Regulations, 41 C.F.R. 1–2.407–8 outlines an administrative procedure whereby an unsuccessful bidder can protest the award to the contracting agency. Such protest may be made either before or after award. *See John W. Danforth Co. v. Veterans Administration*, 461 F.Supp. 1062 (W.D.N.Y.1978). Plaintiffs could also have challenged the award informally by way of General Accounting Office [GAO] Regulations, 4 C.F.R. Part 20. Protest to the GAO, however, is not required prior to bringing such action. *Scanwell Laboratories, Inc. v. Shaffer*, 137 U.S.App.D.C. 371, 424 F.2d 859, 875–76 (1970).

to either the Comptroller General or the courts. Instead it acquiesced in ERDA's decision by participating in the second round of negotiations. Airco evidently was willing to accept a contract if it won the second round, though the technical specifications had been changed to its disadvantage . . . . Thus, it waived its objections to the change in specifications, and we see no reason why it should not be held to have waived its other objections. It is clear that Airco's real complaint is not that a second round of bidding was held, but that it lost the second round.

*Id.* at 1300. *See also John W. Danforth Co. v. Veterans Administration,* 461 F.Supp. 1062 (W.D.N.Y.1978) (preaward protest filed with agency and denied). Here, plaintiffs clearly had notice of both the eligibility of data processors for the award and the mode of bid analysis. The clear import of *Airco* is that plaintiffs are barred from raising their claim here.[14]

Alternatively, the court finds plaintiff's claims on the merits to be without merit. Before embarking on an analysis of such claims, the court will set out the necessary standard of review of a federal contract procurement decision.[15]

The court's review of the agency's determination is limited. In *M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. 221, 455 F.2d 1289 (1971), the court faced a similar challenge to a government procurement award. There, the court limited its inquiry to a determination as to whether the agency had a reasonable basis for making such an award. Judge Leventhal enunciated a two-part inquiry:

(1) Courts should not overturn any procurement determination unless the aggrieved bidder demonstrates that there was no rational basis for the agency's

decision; and (2) even in instances where such a determination is made, there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions in a preprocurement context.

*Id.,* 147 U.S.App.D.C. at 233, 455 F.2d at 1301. *See also General Electric Co. v. Kreps,* 456 F.Supp. 468, 470 (D.D.C.1978); *Schiavone Construction Co. v. Samowitz,* 451 F.Supp. 29 (S.D.N.Y.1978). The absence of such rational basis is demonstrated where "the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner,* 156 U.S.App.D.C. 274, 277, 480 F.2d 1166, 1169 (1973). In applying this standard, the court notes the agency's interpretation of a statute it is empowered to enforce is entitled to deference. *Udall v. Tallman,* 380 U.S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *M. Steinthal & Co. v. Seamans,* 147 U.S.App.D.C. at 230, 455 F.2d at 1298. Such deference has special force "in an area as esoteric and complex as this." *Union Carbide Corp. v. Train,* 73 F.R.D. 620, 624 (S.D.N.Y.1977). Finally, "[a] court should not set aside an agency action as arbitrary and capricious solely because the court would have handled the matter differently. There must be, instead, a showing that the agency has 'transgressed the statutory boundaries.'" *John W. Danforth Co. v. Veterans Administration,* 461 F.Supp. 1062, 1070 (W.D.N.Y.1978). The burden on the plaintiffs is thus quite heavy. *Id.* They have failed to meet the burden here.

■ Plaintiffs first contend that the defendants' action was without any rational basis on the ground that EDSF is not an insurance "carrier" as defined by 42 U.S.C. § 1395u(f) of the Medicare Act. They contend that since a contract for administration of a Part B Supplemental Medicare

---

**14.** In so ruling, the court views certain language in *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859, 875–76 (1970) as being arguably inconsistent with *Airco.*

**15.** Plaintiffs as unsuccessful bidders for a government contract clearly have standing to

raise their objections. *See Airco, Inc. v. Energy Research and Development Administration,* 528 F.2d at 1296; *Scanwell Laboratories, Inc. v. Shaffer,* 137 U.S.App.D.C. 371, 424 F.2d 859 (1970); *John W. Danforth Co. v. Veterans Administration,* 461 F.Supp. 1062 (W.D.N.Y.1978).

plan must be awarded to such an entity under the terms of the above section, the defendants were devoid of statutory authority to make the award to EDSF. Defendants response is two-pronged. They contend: first, by virtue of its experience in the health care industry, EDSF amply falls within the definition of a carrier and second, defendants have authority to award a contract to a noncarrier under the experimental authority granted to them by virtue of 42 U.S.C. § 1395b–1. In the court's view, the defendants could rationally conclude that they had experimental authority to make such a contract under section 1395b–1. The court will therefore not address the issue of whether EDSF by virtue of its experience qualifies as a carrier within the meaning of section 1395u(f).

The Medicare Act of 1965 provided, as noted above, for the payment of fees for supplemental insurance expenditures. Under section 1842(f)(1) of the Act, 42 U.S.C. § 1395u(f)(1), such programs were clearly to be administered by carriers like the plaintiffs.

> For purposes of this part, the term "carrier" means—
>
> (1) with respect to providers of services and other persons, a voluntary association, corporation, partnership, or other nongovernmental organization which is lawfully engaged in providing, paying for, or reimbursing the cost of, health services under group insurance policies or contracts, medical or hospital service agreements, membership or subscription contracts, or similar group arrangements, in consultation or other periodic charges payable to the carrier, including a health benefits plan duly sponsored or underwritten by an employee organization.

42 U.S.C. § 1395u(f)(1).

Simply put, a carrier is an entity lawfully engaged in paying in some form the cost of health services under certain health care insurance policies. Plaintiffs argue at length that EDSF, a data processing company, is not a carrier and hence cannot lawfully be a recipient of such a contract.

The omnibus 1972 amendments to the Medicare Act authorized a number of experiments. 42 U.S.C. § 1395b–1(a) provides:

> The Secretary of Health, Education, and Welfare is authorized, either directly or through grants to public or nonprofit private agencies, institutions, and organizations or contracts with public or private agencies, institutions, and organizations, to develop and engage in experiments and demonstration projects for the following purposes:
>
> \* \* \* \* \* \*
>
> (f) to determine whether, and if so which type of fixed price or performance incentive contract would have the effect of inducing to the greatest degree effective, efficient, and economical performance of agencies and organizations payment under agreements or contracts with the Secretary for health care and services under health programs established by this chapter.

Defendants thus persuasively argue that their decision to award the contract to a noncarrier was well within their lawful authority inasmuch as EDSF is a "public or private agenc[y], institution[s], and organization[s]."

The plain wording of the statute supports such a reading. Further, inasmuch as the term carrier has a highly precise definition in a highly technical area, the failure by Congress to include the term in section 1395b–1 suggests that statute was intended to reach more than carriers. Finally, the court defers to the Secretary's interpretation in this area.

As noted above, the words of the section permit no alternative construction than the one given them by the Secretary. That language does not refer to "carriers." When the words of the statute are clear the court is not empowered to make reference to outside sources to determine their meaning. *See, e. g., Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 201, 96 S.Ct. 1375, 1384, 47 L.Ed.2d 668 (1976) ("the language of a statute controls when sufficiently clear in its

context"); *United States v. Oregon*, 366 U.S. 643, 649, 81 S.Ct. 1278, 6 L.Ed.2d 575 (1961); *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917).[16] Further, the absence of the term carrier in section 1395b–1 is highly significant. The legislative history of section 1395u(f) indicates that the selection of the term carrier reflected a congressional desire to limit administration of the Part B plan to the existing health insurance industry.[17] The fact that such language was subsequently not included in section 1395b–1 suggests a congressional intent that noncarriers be eligible for such contracts. *Cf. United States v. Wong Kim Bo*, 472 F.2d 720, 723 (5th Cir. 1972) (per curiam) ("where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion"). Further, it is important to note that both statutes cover a highly specialized field: nationalized health care. It is safe to assume that such statutes are written for specialists who administer the program. *See* Frankfurter, Some Reflections on the Reading of Statutes, 47 Colum.L.Rev. 527, 536 (1947) ("If a statute is written for ordinary folk, it would be arbitrary not to assume that Congress intended its words to be read with the minds of ordinary men. If they are addressed to specialists they must be read by judges with the minds of the specialists"). In the court's view, the absence of the term carrier would be highly significant to such an administrator. In light of the explicit adoption of the term carrier under prior law, the inference that Congress by excluding the term under section 1395b–1 meant the experimental authority to have a broader reach is ineluctable. Finally, inasmuch as defendants are charged with the administration of both statutes, their interpretation is entitled to special deference.

Plaintiffs raise a number of contentions which, though artfully argued, are without merit. First, they contend that such an interpretation is contradicted by the legislative history of both sections. Although the language of the legislative history of section 1395b–1 uses the term carrier, there is no reference to a requirement that fixed price or performance incentive contracts be made only with carriers.[18] Second, although the apparent purpose for the carrier requirement under section 1395u was to employ the health care expertise of the private insurance field, nothing in the legislative history explains the critical absence of the term carrier in the statutory language. Although plaintiffs argue that defendants have failed to show any legislative history supporting their "interpretation" of the section, it is not their burden to make such a showing in view of the fact that the section's language is otherwise clear. The lack of legislative history and congressional debate concerning the omission of the term carrier does not empower the court to supply one.[19]

Plaintiffs further contend that since specific statutory requirements control more general ones and that repeal of a prior

16. For a general discussion of this point, *see* Sutherland Statutory Construction § 46.01 (4th ed. 1973).

17. S.R.Rep. No. 404 89th Cong., 1st Sess., (1965), *reprinted in* [1965] U.S.Code Cong. & Admin.News, pp. 1943, 1984–85 1992–95, 2283; 111 Cong.Rec. 7244 (remarks of Rep. Secrest); 111 Cong.Rec. 7368 (remarks of Rep. Yates). *See also* 111 Cong.Rec. 7368 (remarks of Rep. Duncan).

18. *See, e. g.*, H.R.Rep. 92–231, 92d Cong., 2d Sess. (1972), *reprinted in* [1972] U.S.Code Cong. & Admin.News, pp. 4989, 5291–92.

19. *See Gemsco, Inc. v. Walling*, 324 U.S. 244, 260, 65 S.Ct. 605, 614, 89 L.Ed. 921 (1945) ("[t]he plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inferences in every direction"). *See also Harris v. Commissioner of Internal Revenue*, 178 F.2d 861, 864 (2d Cir.), *rev'd on other grounds*, 340 U.S. 106, 71 S.Ct. 181, 95 L.Ed. 111 (1950) in which Judge Learned Hand noted "It is always a dangerous business to fill the text of a statute from its purposes, and, although it is a duty often unavoidable, it is utterly unwarranted unless the omission from, or corruption of, the text is plain."

statute by implication is frowned upon, the agency, institution and organization language of section 1395b–1 should be construed as meaning carriers under section 1395u(f). *See United States v. United Continental Tuna Corp.*, 425 U.S. 164, 96 S.Ct. 1319, 47 L.Ed.2d 653 (1976); *MacEvoy Co. v. United States*, 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163 (1944). However, it is at once apparent that the two sections can be read together. Section 1395b–1 authorizes the Secretary to award on a limited experimental basis fixed-price and performance incentive contracts. Such authorization does not repeal in any way the requirements of section 1395u which will continue to govern typical cost reimbursement contracts.[20] In sum, in this court's view, defendants clearly have experimental authority to contract with EDSF for the five year period for the administration of the Part B Medicare Program for the State of Illinois and defendants' decision to award such a contract to EDSF was rational.

 Finally, plaintiffs contend the methodology defendants employed in assessing the bid proposals was arbitrary, capricious and an abuse of discretion. 5 U.S.C. § 706. They raise two objections. First, they contend that defendants erred by applying different standards to the bids of the four insurance carriers as opposed to the noncarrier EDSF in assessing the experience rating portion of the bid evaluation process. Plaintiffs specifically object to the evaluation of EDSF's experience by questions asked during a telephone interview. In contrast, plaintiffs were subjected to an allegedly more comprehensive mode of analysis. Second, HCSC contends that defendants failed to consider the most recent comprehensive data available to them in considering HCSC's experience. The Seventh Circuit recently reviewed the scope of this court's authority to review agency ac-

tion under 5 U.S.C. § 706 in *CFTC v. Hunt*, 1211 F.2d 591 (7th Cir. 1979). It noted that *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971) set out the appropriate standard:

> Section 706(2)(A) requires a finding that the actual choice made was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (1964 ed., Supp. V). To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error in judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

The court in *Hunt* noted that the fact that some other approach to a solution of a problem might have been taken by the agency is immaterial to the determination of rationality. *See also Mourning v. Family Publications Service, Inc.*, 411 U.S. 356, 371, 93 S.Ct. 1652, 36 L.Ed.2d 318 (1973). The court must defer "to the informed experience and judgment of the agency to whom Congress delegated appropriate authority." *Id.* at 371–72, 93 S.Ct. at 1662. Plaintiffs' allegations concerning the bid analysis thus fail because they have failed to contend that defendants have ignored relevant factors and because it is apparent that there has been no clear error in judgment.

Since both of plaintiffs' arguments necessarily depend on the factors considered in the contract award, the court will first set out a brief statement of the bidding proces before addressing the legal issues. Each bidder was evaluated on a 1000 point scale. The difference in score between the awardee, EDSF, and the runner-up, HCSC, was

---

**20.** Finally, the court views plaintiff HCSC citation to a recent H.E.W. report, "Medicare and Medicaid contracting: Report to the Administrator, Health Care Financing Administration, Rept. H.E.W." (October 31, 1978) as not supporting its argument. Like the legislative history, such language cannot defeat the plain

language of the Act. Further, the report states that "[s]elections of carriers under the fixed price or fixed rate contracting process will not be limited to insuring organizations or to organizations currently serving as Medicare carriers." *Id.* at 15.

17.99.[21] The 1000 points were divided into three categories: technical, price and experience.[22] The computation of the experience factor is the only factor challenged here. The experience factor was allotted 350 points of the total 1000.[23] The experience factor was arrived at by multiplying four experience related criteria together. The four factors were: the type of experience; the quality of experience; the length of experience; the volume of claims. Each offeror received the maximum credit for length of experience and volume of claims factors. The type of experience factor was determined by an Experience Rating Factor (ERF). The ERF was weighted in favor of carriers with Part B Medicare experience.[24] Each bidder's quality of experience was analyzed on the basis of each ERF category. Thus, EDSF received credit for both carrier and noncarrier experience. Only one experience criterion, the quality of experience, is challenged here as being defectively calculated.

The quality of experience factor was determined by two different methods, depending upon whether the bidder was a carrier. Since carriers were subject to a yearly analysis, an Annual Contractor Evaluation Report [ACER], the defendants decided to compute the quality of experience from ACER figures.[25] Since ACERs were prepared on a yearly basis, in certain circumstances they were incomplete for the most recent year as of the bidding date. In HCSC's case, the last ACER was completed June 30, 1977. If the ACER did not end as of March 31, 1978 defendants adopted a plan whereby the last period where no ACER had been computed would have been calculated by projecting the final ACER forward at 75% and adding current quarterly quality assurance evaluations [QA] projected at 25%.[26]

The experience of EDSF was necessarily analyzed in a different manner. Since ACER data was unavailable, defendants telephonically interviewed a list of references submitted by EDSF to determine the quality of experience. During the interviews, the references were asked a series of seven questions and were asked to analyze and comment on their answers. Defendants employed no other mode of analysis of EDSF's quality of experience.

Plaintiffs' objection to the quality of experience thus involves two distinct questions. First, plaintiffs charge the telephone interview method gave EDSF an unfair advantage. Second, they argue that by considering 75% of the prior ACER period and 25% of the current quality assurance reports, defendants ignored other, more current evidence. The court shall consider these claims in order.

Plaintiffs complain that by failing to adopt a quality of experience analysis that applied equally to carriers and noncarriers, defendants abused their discretion. Such a claim is without merit. The evaluation was

**21.** The results were as follows:

| Offeror | Total Points | Point Differences from Winning Offer |
| --- | --- | --- |
| 1. EDSF | 905.27 | — |
| 2. HCSC | 887.28 | 17.99 |
| 3. CNA (Alternate) | 864.01 | 41.26 |
| 4. CNA | 846.50 | 68.77 |
| 5. Prudential | 728.54 | 176.73 |
| 6. General American | 684.87 | 220.40 |

**22.** EDSF outscored HCSC in the price category by 45.54 points and $4,695,000. HCSC outscored EDSF in the Technical and Experience evaluations by a total of 27.55 points.

**23.** Price was allotted 450 points; technical, 200.

**24.** The ERF categories were as follows:

| Experience | ERF |
| --- | --- |
| 1. Medicare Carrier—Part B | 1.0 |
| 2. Medicare Intermediary—Part A | .9 |
| 3. Other Federally Funded Health Benefits Program | .8 |
| 4. Medicare Data Processing Sub Contractor | .8 |
| 5. Health Insurer and/or Company with Claims Processing Type Experience | .7 |

**25.** The ACER is a detailed report prepared by government representatives evaluating claims processing and administration work by a given Part B carrier for an established annual period. The representatives prepare the reports based on their daily analysis of the carrier's performance in seven distinct categories.

**26.** The QA measures claim processing, program reimbursement and electronic date processing.

a reasonable exercise of official discretion and inasmuch as there was a rational basis for the evaluation the decision must be upheld.

Defendants adopted a consistent policy of using the most relevant available information in the bid analysis. Whenever possible, established quality rating mechanisms were used to assess the quality of experience. Inasmuch as no ACERs were available for EDSF, defendants had to develop some alternative method. They chose to select names at random from a list of references. Thus, there was no guarantee of uniformly positive responses. During the interviews, references were asked seven questions which roughly covered the materials used in the ACER. They were encouraged to elaborate on their answers. Thus, the entire set of questions spanned the subject area that was employed by the ACERs and quality assessment reports. The decision to use this form of assessment was a legitimate exercise of the agency's discretion. *See Kentron Hawaii, Ltd. v. Warner*, 156 U.S. App.D.C. at 280, 480 F.2d at 1172. In so ruling the court assumes that the telephonic answers elicited information less detailed and comprehensive than that information in the ACER.

However, plaintiffs do not allege that relevant data was ignored. The methodology adopted by defendants considered the relevant experience factors which were fairly analyzed. Under the standard set out above, such facts support a finding that the choice of bid analysis was rational. Defendants' conclusion that the mode of data gathering for the experience factor "insured that the most current applicable data on each officer would be used" was not irrational. Both of the different methods present a mode for discovery of the quality of experience which would reasonably give defendants a basis for a rational judgment. That is all this court need decide.

Plaintiffs argue that the fact that the evaluated data processors received 100% quality of experience ratings while actual carriers received a significantly lower score support the conclusion that the method of assessment was defective. Such an argument is mere speculation. Plaintiffs have failed to demonstrate how the analysis could bear no rational relationship to the actual experience of EDSF. Plaintiffs could have just as easily received the same score because there was a valid empirical difference between their performance and the performance of EDSF. Further, plaintiffs do not suggest that the telephonic method is an unacceptable procurement practice.

The court further notes that plaintiffs had a significant advantage over EDSF in the analysis of the experience factor. In contrast to the ACER, the questionaire was not limited in time. Hence, a response by a reference could cover a much broader period than that defined in the ACER. Indeed, plaintiffs argue the difference in the assignment of the ERF was justified by the vast difference in their experience. Similarly, the difference in experience necessitated a different mode of analysis.

Plaintiffs also contend that defendants failed to consider the most recent data in considering the quality of experience factor. Simply put, plaintiffs contend the projecting of the prior ACER at 75% and the use of the current QA reports at 25% was not the most accurate mode of assessing the quality of experience factor. It is apparent plaintiffs' argument is defective on its face. The fact that a more accurate method of experience evaluation may be available does not render the Secretary's decision arbitrary. The QA data which covered claim processing, program reimbursement and data processing, could rationally have reflected 25% of the total Medicare operation. Plaintiffs do not allege that other data was available or that relevant factors were not considered. Nor do plaintiffs' demonstrate how the projection of their prior ACER scores at 75% was irrational. This decision could have been based upon an agency determination that there traditionally is little variation in ACER scores over a period of a year. The plaintiffs do not allege, however, that this mode of analysis have no relation to their actual experience. On this ground

alone, their complaint fails. The decision to use this mode of analysis represented a rational judgment inasmuch as it considered all the relevant factors and did not represent or clearly demonstrate error in judgment.

Finally, the court views the instant statutory scheme and bidding procedure as highly complex. Necessarily, broad discretion must be accorded the defendants' interpretation and implementation of such programs. In the absence of a clearly demonstrated abuse, this court must necessarily stay its hand in such actions as the present suit.

> [A] court in the exercise of sound judicial discretion may decline to overturn a procurement determination even upon a finding the determination was made in violation of applicable statutes or regulations. This course of conduct is available despite the fact that the concomitant action at law is inadequate: notably, a disappointed bidder may not secure anticipatory profit damages in a government contract situation. . . . Central to such an equitable analysis is the impact of our decision on the public interest.

*General Electric Co. v. Kreps,* 456 F.Supp. 468, 474 (D.D.C.1978) (citation omitted). *See also Union Carbide Corp. v. Train,* 73 F.R.D. 620, 626 (S.D.N.Y.1977). As in that case this court's analysis that defendants' decision was rational rendered the equitable analysis surplusage. However, as in *Kreps,* "the circumstances [of this case] currently presented militate heavily against the invocation of our equitable powers." *Id.* The implementation period of the contract has now run for over seven months. Considerable expenditure by the federal government has already been realized. As of the time of the filing of this suit over $500,000 had been paid out.[27] Invalidation of the award would in all likelihood necessitate a rebidding and performance of the essential service here ultimately at issue would necessarily be greatly impeded. "Even if we were to conclude the procedures followed

and final award were without rational basis, we would be hard put to overturn the award in view of the presence of 'overriding public interest considerations.'" *Id. citing M. Steinthal & Co. v. Seamans,* 147 U.S. App.D.C. 221, 233, 455 F.2d 1289, 1301 (1971).

Thus, defendants' motion must be and is hereby granted. Plaintiffs by virtue of their failure to raise the protest to the procurement methodology and eligibility of EDSF are barred from raising it here. Further, they have failed to meet their heavy burden of demonstrating the contract award was without rational basis. In addition and in any event, the public interest would bar the entry of such injunction. Accordingly, judgment is entered in behalf of defendants and this case is dismissed.

It is so ordered.

---

**27.** Counsel represented to the court that $100,-000 a week was being paid to EDSF during the transition period. Transcript of Proceedings, September 6, 1968, p. 8.