**AQUA–TECH, INC., Plaintiff,**

v.

**UNITED STATES ARMY CORPS OF ENGINEERS, et al., Defendants.**

Civ. A. No. 83–1260.

United States District Court, District of Columbia.

June 7, 1983.

Daniel J. Piliero, II, Kathryn L. Mann, Tighe, Curhan & Piliero, Washington, D.C., for plaintiff.

Scott T. Kragie, Asst. U.S. Atty., Washington, D.C., for defendants.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

Plaintiff Aqua-Tech, Incorporated, has filed suit against the United States Army Corps of Engineers and other officials in the Department of the Army alleging that those defendants, in denying plaintiff's low bid in a formally advertised procurement procedure, failed to comply with the standards of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), violated the Armed Services Procurement Act of 1947, 10 U.S.C. § 2305, and the relevant Defense Acquisition Regulation, 32 C.F.R. § 2–407.1.

Plaintiff contends that it was a responsible bidder whose bid conformed to the advertised procurement standard and that its bid was the most advantageous to the United States, price and other factors considered. Even though its bid was responsible and responsive to the advertised procurement, Aqua-Tech alleges that the contract was unlawfully awarded to another firm.

The plaintiff seeks an order in the nature of mandamus, requiring the Chief, Army Corps of Engineers, to terminate the successful bidder contract because it was awarded arbitrarily, capriciously, and in violation of applicable laws and regulations. Aqua-Tech also seeks permanent injunctive relief and judgment declaring that it should be awarded the contract.

The complaint was filed on May 2, 1983. The parties agreed upon an accelerated briefing schedule and that the matter could be heard on cross motions for summary judgment. The Court has considered the

various memoranda, affidavits, exhibits and oral argument of counsel for the parties, and concludes that summary judgment should be granted to the defendants and this proceeding be dismissed. The reasons for this determination are set out in the discussion which follows.

## BACKGROUND

On December 3, 1982, the United States Army Corps of Engineers issued an Invitation for Bids (IFB), for removal of toxic wastes from the Chem-Dyne Site located in Hamilton, Ohio. The IFB originally provided that bids would be received on January 18, 1983. Pursuant to a series of amendments, the deadline for submission of bids was extended to March 17, 1983.

Hazardous wastes located on the Chem-Dyne Site pose a significant risk to the health and welfare of the public and the environment through contamination of the ground water and from fire. Any delay in the removal of such wastes presents a direct threat to the public health of the community and increases the possibility of additional environmental damage. Delay at this time would be especially critical because failure to complete the clean-up prior to next winter (1983–84) would create substantially greater likelihood of rupture of vessels holding the wastes. Affidavits of David C. Strayer, ¶¶ 4–6,[1] and Stanley Carlock, ¶ 18.[2]

The IFB required, *inter alia,* transportation of the waste materials directly to an approved disposal site, and disposal of the waste material at that site. Polychlorinated Biphenyls (PCBs) are one of the primary categories of toxic and hazardous waste materials involved in the clean-up of the site. The U.S. Environmental Protection Agency (EPA) requires that waste materials containing PCBs with concentrations exceeding 500 parts per million (ppm) be disposed of only in an incinerator which complies with Annex I of EPA regulations issued pursuant to the Toxic Substances Control Act, 15 U.S.C. § 2605. *See* 40 C.F.R. §§ 761.60 and 761.70.

Counsel for the parties have agreed that there are only two Annex I Incinerators in the United States which are permitted to burn PCBs exceeding 500 ppm. Those incinerators are operated by ENSCO, Inc. and Rollins, Inc.

Paragraphs 3.1 and 3.2 of Section 1A of the special provisions of the IFB required the bidder to submit certain information and certifications with the bid, and also provided that "[f]ailure to submit the information and certification will render the bid nonresponsive, and the bid will not be considered for award." Note 4 to the bid forms requires that each bidder "[l]ist approved disposal facilities and transporters the bidder proposes to use on the [Bid Form] pages provided." This requirement was reiterated elsewhere in the IFB.

4.2. The Contractor must supply as part of his bid proposal a list of proposed disposal sites, type of disposal at this site, as well as types of materials and quantities which will be accepted.... The Contractor must also provide at this time a letter from each proposed disposal site agreeing to the acceptance of the proposed quantities and type of materials to be disposed.

4.3. .... The Contractor shall act to insure that the wastes will be promptly removed from the site and disposed of at the assigned disposal site immediately.

The IFB included within its bid forms a "Plant and Equipment Schedule" (Schedule) for the designation of the proposed "Annex I Incinerator" facility, its location, the wastes to be disposed of at that facility, and certification that the facility holds valid permits for all activities proposed at that facility. Further, the Schedule required the bidder to "[a]ttach letter of intent/commitment from facility to accept the type, quantity, and concentration of wastes for the duration of the contract as specified." The purpose of these requirements was to en-

---

1. Environmental Engineer, Ohio Environmental Protection Agency filed May 17, 1983.

2. Superfund Coordinator, Omaha District, U.S. Army Corps of Engineers, filed May 17, 1983.

sure "that the wastes will be removed from the [Chem-Dyne] site and disposed of at the assigned disposal site immediately," and that it be done in accordance with all state and federal requirements. Carlock Aff. ¶ 7.

The IFB also required that waste be hauled directly from the project site to the final disposal site, and prohibited interim transportation to a waste storage facility. This requirement was intended to minimize the risk of spillage or contamination from unnecessary handling and transport of the material. Carlock Aff. ¶ 8.

Seven bids were received in response to the IFB. The bids were opened on March 17, 1983. Aqua-Tech, Inc., submitted the lowest bid ($1.35 million) followed by Sevenson Construction Corp. ($1.53 million), and O.H. Materials Co. (O.H.) ($1.76 million). Carlock Aff. ¶ 10. On April 5, 1983, the contract was awarded to O.H. Materials Co. and Aqua-Tech was notified that its bid had been disqualified. Aqua-Tech, Inc., did not include with its bid the Schedule pertaining to the Annex I Incinerator which it intended to use for burning PCBs exceeding 500 parts per million. However, Aqua-Tech did submit two forms entitled "Approved Solid Waste Landfill One." The second form was altered by inserting the word "Incinerator" after the title, and Chemical Waste Management of Alabama, Inc. ("CWM" or "Chemical Waste") was designated as the facility to be used. Carlock Aff. ¶ 11.

There is a dispute as to whether Aqua-Tech submitted any letter of intent/commitment to receive wastes containing PCBs in excess of 500 ppm. The official bid file maintained by the Corps does not contain any such document. Carlock Aff. ¶ 11. Defendants contend that the first time they received a copy of the agreement between CWM and Aqua-Tech was when Aqua-Tech served the complaint in this action on defendants on May 3, 1983. Carlock Aff. ¶ 11. Although plaintiff's bid, original bid protest, and initial affidavits

and pleadings filed in this case make no mention of the submission of such a document with its bid, President Opitz of Aqua-Tech states in his supplemental affidavit "that our records reflect that the bid form . . . did contain a copy of the agreement. . . ." Supplemental Affidavit of David W. Opitz.[3]

The agreement between CWM and Aqua-Tech covers only waste materials "generated at Port Washington, Wisconsin."[4] The only facility designated for disposal of "PCB liquids containing greater than 500 ppm PCB," is "[T]he 'Vulcanus', Ocean Incineration Vessel." *Id.* at ¶ 2e. Indeed, the agreement prohibits use of any other disposal facility without prior written consent. *Id.* at ¶ 14. The agreement provides that waste materials be transported to and stored at CWM's storage facility at Emelle, Alabama. *Id.* at ¶ 2b. Emelle, Alabama, does not have a port facility for ocean-going vessels. Further, the agreement expires by its terms on June 18, 1983. *Id.* at p. 1 and ¶ 4.

During a telephone conversation on March 22, 1983, Aqua-Tech informed defendants that it intended to send PCB liquids with concentrations exceeding 500 ppm to CWM for incineration on the Vulcanus. Carlock Aff. ¶ 12; Opitz Aff. ¶ 6. CWM has an application pending with the EPA for use of the Vulcanus as a disposal facility for incineration of PCBs exceeding 500 ppm. Carlock Aff. ¶ 13; Opitz Aff. ¶ 6. However, CWM currently does not have authorization from EPA to dispose of this type of waste, and did not have such authorization at the time of the bid and award. Carlock Aff. ¶ 13.

In that same March 22 conversation, plaintiff stated that, "[i]f the Vulcanus was not permitted, Aqua-Tech would have Chemical Waste Management use whatever facility is appropriately licensed at such time that the disposal becomes necessary." Opitz Aff. ¶ 6. There is an apparent conflict in the record as to whether Aqua-Tech

---

3. President of Aqua-Tech, filed May 23, 1983.

4. Plaintiff's Exhibit F at ¶ 1 attached to plaintiff's Motion for Preliminary Injunction, filed May 3, 1983.

further identified any Annex I Incinerator facility which CWM would utilize if the Vulcanus was not approved. Defendants insist that "Aqua-Tech did not mention any agreement with Chemical Waste Management, or between Chemical Waste Management and any other disposal facility." Affidavit of Robert F. Smart ¶ 2.[5] *See also* Carlock Aff. ¶ 12. In contrast, President Opitz's supplemental affidavit contends that "we also stated that if [the Vulcanus were not approved], ENSCO or Rollins would be used for incineration of the PCBs over 500 ppm under the agreement with Chemical Waste Management which we had submitted and the bid which we had submitted designating Chemical Waste Management as a sub-contractor of Aqua-Tech for this purpose." Supp. Opitz Aff. ¶ 5. It is noted, however, that no contract or commitment between CWM and Rollins or EN-SCO was ever provided, even according to Aqua-Tech's version of this conversation.

The defendants conducted a pre-award survey of the bidders, and determined that the disposal facility proposed by Aqua-Tech had not been EPA approved for incineration of PCBs exceeding 500 ppm. Since Aqua-Tech had not designated an approved Annex I Incinerator, and had not submitted a letter of intent commitment from a facility approved to dispose of such wastes, Aqua-Tech's bid was rejected as non-responsive. Carlock Aff. ¶ 15.

On April 5, 1983, the contract was awarded to O.H. Materials Co. The O.H. bid identified ENSCO, Inc., an EPA approved Annex I Incinerator facility, as a facility it intended to use to burn PCBs exceeding 500 ppm. Carlock Aff. ¶ 16. O.H. also submitted, as part of its bid, a letter of intent from ENSCO, Inc., dated March 14, 1983, in which ENSCO agreed to accept, *inter alia,* waste materials with PCBs in excess of 500 ppm identified in the IFB.[6]

The Plant and Equipment Schedules submitted with O.H.'s bid was modified by combining the Schedule entitled "Annex I Incinerator" (DX–1 at BF–3) with the Schedule entitled "Waste Incinerator Two" (DX–1 at BF–6). A Waste Incinerator may be used for disposal of PCB liquids with concentrations between 50 and 500 ppm, and an Annex I Incinerator is required for disposal of PCBs exceeding 500 ppm. O.H. designated ENSCO, Inc., as the disposal facility which would perform both of these functions. ENSCO, Inc., has a multipurpose facility with both a Waste Incinerator and an Annex I Incinerator, and is permitted by the EPA to perform both functions. O.H. Materials also submitted a second Plant and Equipment Schedule entitled "Waste Incinerator Two and Annex I Incinerator," and designated CWM as an alternate disposal facility. (DX–3 at BF–6 (second)). The Schedule stated that the CWM had an application for approval pending with the EPA. The bid of O.H. was accepted based upon the designation of EN-SCO, Inc., in the first schedule referred to above. Carlock Aff. ¶ 16.

O.H. Materials commenced performance of and has made substantial expenditures and commitments in good faith reliance upon the contract. Carlock Aff. ¶ 17. Defendants estimate that the government may incur additional costs of approximately $437,845.00 if the contract were to be terminated for the convenience of the government and re-awarded to Aqua-Tech. Affidavit of Joseph R. Turner.[7] O.H. Materials has informed defendants in writing that it will submit a claim in excess of $400,000 if its contract is terminated after May 20, 1983.

## ANALYSIS AND CONCLUSIONS

■ The government's contention that this Court lacks subject matter jurisdiction

---

**5.** Environmental Engineer/Project Manager, Omaha District, Army Corps of Engineers, filed May 17, 1983.

**6.** Defendants' Exhibit (DX) 3, attached to defendants' Motion to Dismiss or in the Alternative for Summary Judgment, filed May 17, 1983, at Appendix C.

**7.** Chief, Supervision and Inspection Branch, Construction Division, Huntington District, U.S. Army Corps of Engineers, Huntington, West Virginia, filed May 17, 1983.

is lacking in merit. The Federal Courts Improvement Act, Pub.L. 97–164, 96 Stat. 25, 28 U.S.C. § 1491, does not divest courts of jurisdiction over post-award disappointed-bidder proceedings. *American District Telegraph v. Department of Energy*, 555 F.Supp. 1244, 1247–48 (D.D.C.1983). Even after the Federal Courts Improvement Act, an unsuccessful bidder on a government contract has standing to sue on grounds of unlawful activity during the procurement process as provided for in *Scanwell Laboratories, Inc. v. Shaffer*, 424 F.2d 859 (D.C.Cir. 1970).

■ However, to prevail in a disappointed-bidder proceeding, Aqua-Tech bears the "heavy burden of showing either that ... the procurement official's decisions on matters committed primarily to his own discretion had no rational basis, or that ... the procurement procedure involved a clear and prejudicial violation of applicable statutes or regulations." *Kentron Hawaii, Ltd. v. Warner*, 480 F.2d 1166, 1169 (D.C.Cir. 1973) (footnotes omitted). *See M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir.1971). These standards are tempered by the overriding principle of judicial restraint and deference to the contracting officer's judgment in the unique environment of government procurement. *Id.* at 1301–02. Even where an aggrieved bidder demonstrates that a contract was improperly awarded to another bidder, "there is room for sound judicial discretion, in the presence of overriding public interest considerations, to refuse to entertain declaratory or injunctive actions . . . ." *Id.* at 1301. *See General Electric Co. v. Kreps*, 456 F.Supp. 468 (D.D.C.1978).

■ The rejection of Aqua-Tech's low bid by the Army Corps of Engineers was premised upon the finding that failure to designate and provide a written commitment from an approved Annex I Incinerator rendered plaintiff's bid "non-responsive." That term is given meaning by Section 2–301 of the Defense Acquisition Regulations (DAR), 32 C.F.R. § 2–301(a), (c), which provides:

To be considered for award, a bid must comply in all material respects with the invitation for bids so that, both as to the method and timeliness of submission and as to the substance of any resulting contract, all bidders may stand on an equal footing and the integrity of the formal advertising system may be maintained.

\* \* \* \* \* \*

Bids should be filled out, executed, and submitted in accordance with the instructions which are contained in the invitation for bids. If a bidder uses his own bid form or a letter to submit a bid, the bid may be considered only if (i) the bidder accepts all the terms and conditions of the invitation, and (ii) awards on the bid would result in a binding contract the terms and conditions of which do not vary from the terms and conditions of the invitation.

Those requirements necessarily apply to the bids as submitted, for to allow supplementation after opening would invite mischief and unduly delay award determinations. *See Northeast Constr. Co. v. Romney*, 485 F.2d 752, 759–60 (D.C.Cir.1973). The practical test of responsiveness is whether the bid promises exactly what the government seeks to acquire, as defined by the IFB. *Eugene Drexler*, B–168518, 49 Comp.Gen. 553 (1970). And, where the IFB instructs a bidder to spell out how tasks are to be represented or performed in order to assist the agency to evaluate the system being offered, they must be followed by the bidder for a bid to be deemed responsive. *Western Waterproofing Co. Inc.*, B–183155, May 20, 1975, 75–1 CPD ¶ 306. *Cummins Diesel Engines, Inc.*, B–184970, April 13, 1976, 76–1 CPD ¶ 248.

■ Plaintiff argues that under DAR 2–405, 32 C.F.R. § 2–405, it is excepted from minor informalities or irregularities in a bid process. However, requirements that bidders identify the proposed disposal facilities and provide commitments from them to accept and dispose of the wastes from the Chem-Dyne Site are not minor formalities to be waived or cured by supplementation after opening of the bids. Rather, those

requirements relate directly to the central purpose of the bid process: namely, to obtain binding assurances that the wastes would be promptly and properly disposed of in accordance with all state and federal regulations. As a result, these requirements significantly affect performance of the specific services being procured. This conclusion is amply reinforced by the IFB's repeated instructions to provide such information on the designated bid forms and its warning that failure to provide such data would render the bid nonresponsive. The failure and/or refusal of the Corps of Engineers to consider information allegedly offered by plaintiff after bid opening is not fatal to an award of the contract to a higher-cost bidder.

Aqua-Tech's bid failed to provide for disposal of PCB concentrations in excess of 500 ppm at a lawfully approved disposal facility. Its designation of Chemical Waste as the proposed disposal facility was insufficient because its incinerator vessel, the Vulcanus, had not been approved by the EPA as an Annex I Incinerator at the time or date of the bid opening, or even when the argument on the summary judgment motions were presented before this Court. Plaintiff's argument that its designation of Chemical Waste was sufficient because it was only required to identify the facility which would "receive," rather than dispose of the wastes, is inconsistent with both the IFB instructions and with logic. Plaintiff's strained reading and construction of the bid forms themselves fails to overcome the clear instructions to "[l]ist approved *disposal* facilities and transporters the bidder proposes to use on the [Bid Form] pages provided."

The Court need not resolve the disputed factual issue of whether a copy of the Waste Transportation and Disposal Agreement between Chemical Waste and Aqua-Tech was submitted with Aqua-Tech's bid, because that agreement adds nothing of substance to the bid form listing CWM as the relevant facility. The agreement proposes only use of the Vulcanus for incineration of PCB concentrations in excess of 500 ppm—a task which it may not lawfully perform. Moreover, the agreement does not encompass any wastes originating in Ohio, where the Chem-Dyne Site is located, and it expires by its own terms well before the Chem-Dyne contract could be completed. Finally, plaintiff's blanket offer to comply with specifications of the IFB cannot be deemed to cure the deficiencies in its bid. *Empire Gas Eng. Co.,* B–146485, 41 Comp.Gen. 192 (1961).

Plaintiff's attacks upon the bid of O.H. Materials Co. are unpersuasive. O.H.'s combination of the "Waste Incinerator" and "Annex I Incinerator" schedules is not defective because all of the information required by the two separate forms is provided, thus demonstrating that "the bidder accepts all of the terms and conditions of the original [forms]." DAR 2–301, 32 C.F.R. § 2–301(c). The designated facility, ENSCO, Inc., is authorized by law to dispose of all wastes above 50 ppm, including those over 500 ppm. The March 14, 1983, letter from ENSCO, which was supplied within the March 17, 1983, deadline for bid submissions, makes an unequivocal commitment to accept PCBs in excess of 500 ppm, including items 10c and 10e on p. BF–1a of the IFB. Finally, plaintiff's suggestion that designation of Rose Chemical Co. on the page numbered BF–3 violates the IFB ignores the fact that that form, as submitted by O.H. Materials Co., is not titled "Annex I Incinerator," but rather "PCB Detoxification," which is a wholly different function (decontamination) unrelated to incineration of wastes. Defendant's determination that O.H. Materials' bid was responsible was not discriminatory vis-a-vis Aqua-Tech's bid because Aqua-Tech's bid did not contain the same information, i.e., identification and commitment from an approved Annex I Incinerator facility.

The plaintiff makes much of the March 27, 1983, conversation between Aqua-Tech and the defendants. But the factual dispute concerning that conversation post-dated the March 17, 1983, bid opening and thus it need not be resolved. Even if the Court were to find that plaintiff was entitled to make a supplemental submission and that

the March 22, 1983, telephone conversation included all of the information alleged by plaintiff, the alternative scheme proposed (to have Chemical Waste utilize ENSCO or Rollins' Annex I Incinerator if the Vulcanus were not available) would violate the IFB. According to plaintiff's version of events, it has never provided a letter of intent/commitment from Rollins or ENSCO. And further, if such a relationship were documented, it would violate the IFB's clear instructions that wastes must be *transported directly* from the Chem-Dyne Site to the final disposal facility and that the bidder assume sole responsibility to ensure that the wastes are in fact promptly disposed of at that location. The agreement between Aqua-Tech and Chemical Waste, and their representations as to the alternative plan for use of ENSCO or Rollins, reveal that the wastes were to be transported "to the permitted storage facility at ... Emelle, Alabama." However, the IFB required that wastes be *directly and promptly* disposed of at the *final disposal site.* Those requirements are not mere technicalities, but important contract specifications designed to avoid unnecessary risks in the clean-up of the Chem-Dyne Site.

Aside from the lack of merit, the equities presented weigh heavily against the plaintiff's protest and request for relief. The public interest in ensuring prompt removal of the wastes prior to the onset of winter temperatures militates strongly against any court-imposed delay of the clean-up activities. Based upon proffers and representations of counsel made at the final hearing, the cost advantage offered by Aqua-Tech's bid has undoubtedly been diminished. O.H. Materials has made substantial expenditures in implementing the contract since issuance of the notice to proceed on April 27, 1983. Thus, it is doubtful the public or the government would benefit from termination of the O.H. Materials contract. The various interests therefore weigh against termination of the present contract. *Washington Metropolitan Area Transit Commission v. Holiday Tours,* 559 F.2d 841, 843 (D.C.Cir.1977); *Virginia Petroleum Jobbers*

*Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir. 1958).

For the reasons stated above the Court concludes that the plaintiff's bid protest challenge should be rejected. An appropriate Order will be entered.